**Betty Jo MAYESKE, Appellant,**

**v.**

**INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, International Association of Fire Fighters Officers Retirement Plan, International Association of Fire Fighters Staff Representatives Pension Plan, International Association of Fire Fighters Employees' Pension Plan, Alfred K. Whitehead, Elliott Hastings, James McGowan, Daniel Eberhart, and John A. Gannon, Appellees.**

**Civ. A. No. 89–7104.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 19, 1990.

Decided June 8, 1990.

---

Paul A. Green, with whom Marilyn L. Baker, Washington, D.C., was on the brief, for appellant.

Erick J. Genser, with whom Thomas A. Woodley, Washington, D.C., was on the brief, for appellees.

Before WALD, Chief Judge, and RUTH BADER GINSBURG and THOMAS, Circuit Judges.

Opinion for the court filed by Circuit Judge CLARENCE THOMAS.

CLARENCE THOMAS, Circuit Judge:

■ Appellant Betty Jo Mayeske former-ly worked as the director of the Open Learning Fire Service Program, an edu-cational effort conducted from 1978 to 1986 by the International Association of Fire Fighters (IAFF). A dispute over May-eske's pension rights has given rise to this suit, in which Mayeske[1] seeks recovery on

---

**1.** This action originally had four plaintiffs: Mayeske and the three members of her Open Learning Program staff. In giving notice of their appeal, the plaintiffs' attorney listed the appellants as "Plaintiffs Betty Jo Mayeske, *et al.*" Last September, this court dismissed the three staff members from the appeal, relying on *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 317–18, 108 S.Ct. 2405, 2409, 101 L.Ed.2d 285 (1988), in which the Supreme Court held that "et al." does not name parties to an appeal as specifically as rule 3(c) of the Federal Rules of Appellate Procedure requires. *Mayeske v. International Ass'n of Fire Fighters,* No. 89–7104, slip op. at 1 (D.C.Cir. Sept. 22, 1989); *see* Fed.R. App.P. 3(c) ("The notice of appeal shall specify the party or parties taking the appeal...."). Mayeske's former co-plaintiffs have repeatedly

several ERISA-based[2] and common-law contract and tort theories. The decisive question is whether Mayeske was an IAFF employee. The district court, holding that Mayeske did not enjoy IAFF employee status, granted the IAFF's motion for summary judgment on all but one of Mayeske's claims and dismissed the remaining claim for lack of jurisdiction. Because we hold that Mayeske was in fact an IAFF employee, we vacate the judgment and remand.

## I. BACKGROUND

The IAFF is a union that represents over 170,000 paid firefighters in the United States and Canada. In 1977, the IAFF sought and received a federal grant to study higher-education opportunities for firefighters. The IAFF hired Mayeske, who was then the director of the University of Maryland's Open University Division, to conduct the study. A year later, the IAFF received another federal grant and created the Open Learning Program, which offered firefighters non-campus-bound courses and degree programs. Mayeske became the Open Learning Program's full-time director in 1978; over the next several years, she hired a three-person staff. In response to annual proposals written by the Open Learning Program staff and reviewed and submitted by top IAFF officers, the Federal Emergency Management Agency (FEMA) granted funds for the Program through November 1986, when the IAFF declined to seek further FEMA grants.

Mayeske and her staff operated as a special unit within the IAFF, devoted entirely to the Open Learning Program. Nearly all of the Open Learning Program's funding came from FEMA grants, although the record indicates that the IAFF subsidized the program in at least one year. *See* Memorandum from Loyd Kneale to David Martin (May 27, 1986) (discussing "non-federal (IAFF) share" of Open Learn-

ing Program budget for 1985–1986), J.A. at A448. As is typical under negotiated government contracts, FEMA retained significant power to oversee Mayeske's and her staff's work. Each IAFF proposal for the Open Learning Program specified tasks and costs in detail, and each resulting "Cooperative Agreement" imposed a detailed statement of work. In addition, two FEMA officials had the right to monitor the Program's spending and performance and to audit the Program if desired

Notwithstanding their group's distinct mission, Mayeske and her staff were in most respects treated like IAFF employees. They occupied offices at the IAFF's Washington, D.C., headquarters; the district court characterized these offices as "separate from, though physically collocated with, the IAFF offices." *Mayeske v. International Ass'n of Firefighters*, No. 86–3283, slip op. at 6, 1989 WL 37154 (D.D.C. Mar. 30, 1989). The IAFF paid Mayeske and her staff with IAFF checks. It listed itself on many personnel forms as Mayeske's and her staff's employer. Finally, it subjected Mayeske and her staff to the IAFF's personnel policies on hours of work, attendance and leave, discipline, and grievances.

The record indicates, moreover, that the IAFF officers treated the Open Learning Program as just another function within the IAFF. The IAFF's literature frequently reported on the Open Learning Program's progress and hailed the efforts of the "IAFF's Open Learning staff, directed by Dr. Betty Jo Mayeske." *E.g.*, International Ass'n of Fire Fighters, Officers' Report 18 (Aug. 4–8, 1986), J.A. at A404. This literature also noted how the Open Learning Program served the IAFF's broader goals. *See, e.g., id.* at 20 ("The Open Learning program is relevant to our purpose of increasing benefits for our members.... We plan to insure that the

---

attacked their dismissal from this case, but have failed to overcome it. *See, e.g., Mayeske v. International Ass'n of Fire Fighters*, No. 89–7223, slip op. (D.C.Cir. Feb. 5, 1990) (summarily affirming district court's refusal to amend its judgment, which also listed plaintiffs as "Betty Jo Mayeske, *et al.*"). Although the present opin-

ion, for the sake of accuracy, often refers to "Mayeske and her staff," only Mayeske is now a party to this appeal.

2. *See* Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461.

OLFSP thrives because this project is important to our members and the future of our profession."), J.A. at A406. The record shows that the IAFF's President, John A. Gannon, dealt with Mayeske as he would deal with the head of any IAFF department. *See, e.g.,* Memorandum from John A. Gannon to Ted Kastelic at 1 (July 9, 1985) ("I want it clearly understood that Betty Jo Mayeske's salary shall not exceed the salary of the other IAFF Department Directors...."), J.A. at A407; Memorandum from John A. Gannon to All Employees of the IAFF Washington Office at 1 (July 10, 1981) (establishing new "structure of the IAFF office"; listing Open Learning Program as one of ten departments reporting to the Assistant to the President), J.A. at A364. When Gannon issued Mayeske a directive concerning her staff's pay, moreover, Mayeske responded as a subordinate manager would: she assured Gannon that "[t]he budget ha[d] been changed per [his] order." Memorandum from B.J. Mayeske to President Gannon at 1 (July 16, 1985), J.A. at A408.

The events that precipitated this lawsuit began in early 1985, when IAFF officers were advised that the union's pension plans might be violating an antidiscrimination provision of the Internal Revenue Code, 26 U.S.C. § 410(b)(1),[3] and that the plans were in danger of losing their tax-exempt status. The officers were concerned that the Internal Revenue Service might decide that "grant employees," such as Mayeske, were IAFF employees for section 410(b) purposes. Since the IAFF had denied pension coverage to all grant employees, *see, e.g.,* Affidavit of Betty Jo Mayeske at 2 (Dec. 17, 1987), J.A. at A547, the officers saw a possibility that the IAFF's plans would cover too low a percentage of employees, thus contravening the antidiscrimination rule. Instead of offering pension coverage to Mayeske and other grant employees or seeking a ruling from the IRS, the IAFF tried to take advantage of 26 U.S.C. § 410(b)(3)(A),[4] which permits employers to exclude from the antidiscrimination test any employees whose pension benefits are included in a collective bargaining agreement. In late spring 1986, the officers tried to convince a unit of the Office and Professional Employees International Union to represent Mayeske and her staff for the limited purpose of bargaining over fringe benefits, including pension benefits. When that union refused, the officers asked Mayeske and her staff to sign an "Agreement Establishing the Association of IAFF Grant Employees" and to collectively bargain with the IAFF over fringe benefits.[5] Mayeske and her staff declined to sign the agreement and sought legal advice.

Shortly thereafter, a lawyer representing Mayeske and her staff requested, in writing, that IAFF President Gannon provide a copy of the IAFF's pension plans and related documents. In response, Gannon told Mayeske that he would not provide the documents, and that she had no pension rights. A later, similar request, sent to the

---

**3.** The present version of section 410(b)(1) reads, in pertinent part:

A trust shall not constitute a qualified trust under section 401(a) unless such trust is designated by the employer as part of a plan which meets 1 of the following requirements:

(A) The plan benefits at least 70 percent of employees who are not highly compensated employees.

(B) The plan benefits—

(i) a percentage of employees who are not highly compensated employees which is at least 70 percent of

(ii) the percentage of highly compensated employees benefiting under the plan.

(C) The plan meets the requirements of paragraph (2)[, which establishes an "average benefit percentage test"].

26 U.S.C. § 410(b)(1) (amended 1986).

**4.** Subsection 410(b)(3)(A) provides:

For purposes of this subsection, there shall be excluded from consideration—

(A) employees who are included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers, if there is evidence that retirement benefits were the subject of good faith bargaining between such employee representatives and such employer or employers[.]

**5.** To pursue this solution, the IAFF had to assume that, at least for purposes of subsection 410(b)(3)(A), Mayeske and her staff were IAFF employees.

IAFF's General Counsel, drew the reply that Mayeske was not entitled to receive plan documents because she was not a participant in or a beneficiary of any IAFF pension plan. Over the following months, relations between Mayeske and the IAFF officers deteriorated. Mayeske alleges that the officers retaliated against her by downgrading her parking privileges, by prohibiting her from attending the IAFF's 1986 convention, and, ultimately, by ending the IAFF's sponsorship of the Open Learning Program. The IAFF, in contrast, offers innocent explanations for these actions. *See Mayeske*, No. 86–3283, slip op. at 11–12. In any event, when the IAFF's involvement with the Open Learning Program ended, so did Mayeske's employment.

On November 29, 1986, Mayeske filed this action against the IAFF, its pension funds, and several IAFF officers.[6] She sought her accrued pension benefits, *see* 29 U.S.C. § 1132(a)(1)(B), as well as general damages and damages under ERISA for failure to provide pension plan information, *see id.* § 1132(c)(1)(B), retaliation, *see id.* § 1140, breach of fiduciary duty, *see id.* § 1104(a)(1)(D), breach of the IAFF's contracts with FEMA, under which Mayeske claimed to be an intended third-party beneficiary, and conversion of FEMA payments that the IAFF reportedly should have been contributing to Mayeske's pension fund. The parties filed cross-motions for summary judgment. The district court granted the IAFF's motion and denied Mayeske's.

In evaluating Mayeske's statutory claims, the district court, noting that ERISA, 29 U.S.C. § 1132(a), affords a claim for relief only to pension plan beneficiaries, fiduciaries, and participants, sought to determine whether Mayeske was a participant in any of the IAFF's pension plans. *Mayeske*, No. 86–3283, slip op. at 18–19. After properly stating that " '[p]articipant' within the statutory scheme of ERISA is a subset of the term 'employee,' " *id.* at 19, the court analyzed Mayeske's employment status with the IAFF. Because both ERISA, 29 U.S.C. § 1002(6), and the IAFF

pension plans define "employee" in circular terms, the court turned to the common law. Applying the standards set out in *Holt v. Winpisinger*, 811 F.2d 1532 (D.C.Cir.1987), the court held that Mayeske was an independent contractor of the IAFF, not an IAFF employee. *Mayeske*, No. 86–3283, slip op. at 21–23. It concluded that Mayeske "ha[d] no ERISA-related entitlements or protections with respect to any of the IAFF plans," *id.* at 23, and granted the defendants' motion for summary judgment on all of Mayeske's ERISA-based claims. Based on its assumption that Mayeske's remaining claims invoked District of Columbia law, the court refused to exercise pendent jurisdiction over those common-law claims, relying on *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."). *Mayeske*, No. 86–3283, slip op. at 34–35. Mayeske has appealed.

## II. DISCUSSION

The summary judgment in favor of the IAFF rests on a flawed premise: that Mayeske was not the IAFF's employee. The district court properly determined that parallel litigation before the National Labor Relations Board did not preclude the court from deciding that Mayeske was not an IAFF employee. And, in adjudicating the employment status issue, the court correctly held that the common law of agency, as explained in *Holt* and like cases, governs Mayeske's status with the IAFF. The district court, however, drew a faulty conclusion under the *Holt* standard.

### A. *Issue Preclusion*

█ For almost as long as Mayeske's suit has been pending, the Open Learning Program staff has had an unfair-labor-practices charge before the NLRB. *See, e.g., International Ass'n of Firefighters*, 297 N.L.R.B. No. 146, slip op., 1989–1990 NLRB Dec. (CCH) ¶ 15,986 (Mar. 9, 1990)

---

**6.** The discussion will refer to the defendants/appellees collectively as "the IAFF," since the analysis does not rely on any distinctions between the defendants/appellees.

(supplemental decision after remand); *International Ass'n of Firefighters*, No. 5–CA–18,553, slip op. at 1 (Jan. 29, 1988) (ALJ's initial decision) (noting that charge was first filed on Dec. 15, 1986). Although a member of Mayeske's staff filed the charge, the charge makes claims regarding Mayeske's termination. *See, e.g., International Ass'n of Firefighters*, No. 5–CA–18,-533, slip op. at 1 (June 7, 1989) (ALJ's decision on remand). In evaluating its jurisdiction over the charge, the NLRB panel concluded that the IAFF was "the employer of these employees." *International Ass'n of Firefighters*, 292 N.L.R.B. No. 114, slip op. at 7, 1988–1989 NLRB Dec. (CCH) ¶ 15,465, at 29,028 (Feb. 10, 1989) (decision and order remanding proceeding). Mayeske contends that issue preclusion bars the courts from reexamining that conclusion. We disagree.

■ When an administrative adjudication resolves disputed issues, parties to the administrative case ordinarily may not relitigate those issues in subsequent cases. *See United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966) (issue preclusion can apply to agencies' findings of fact); *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 842 F.2d 402, 409 (D.C.Cir.1988) (applying issue preclusion analysis to agency's application of law to fact), *cert. denied,* ── U.S. ──, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989); *see also* Restatement (Second) of Judgments § 83(1) (1982) (not distinguishing between resolutions of factual and legal issues by agencies).[7] Issue preclusion does not apply, however, when the issue decided by an earlier proceeding differs substantially from the issue at hand. *See, e.g., Pantex Towing Corp. v. Glidewell*, 763 F.2d 1241, 1245 (11th Cir.1985); Restatement § 27 comment c.

In deciding, for jurisdictional purposes, whether Mayeske and her staff were IAFF employees, the NLRB focused on whether the IAFF, rather than FEMA, had authority to set their pay, benefits, and working conditions. *See* 292 N.L.R.B. No. 114, slip op. at 5–7, 1988–1989 NLRB Dec. (CCH) at 29,027–28. This test for jurisdiction over unfair-labor-practices charges derives from *Res–Care, Inc.*, 280 N.L.R.B. 670 (1986). The NLRB applies the *Res–Care* test in cases involving "employer[s] with close ties to an exempt government entity," *id.* at 672, to determine whether such employers can meaningfully bargain with labor organizations. *See id.* In the case before us, however, deciding whether Mayeske was an "individual employed by an employer" under ERISA, 29 U.S.C. § 1002(6), involves a broader test derived from the common law of agency. *See infra* pp. 1553–1554. Although no single factor controls the outcome under the common-law test, the question of control over Mayeske's day-to-day activities plays a central role. Since the NLRB, in applying the National Labor Relations Act, made an inquiry different from the one that the ERISA case law requires us to make, we see no basis for giving the NLRB's decision issue-preclusive effect. We must judge on the merits whether Mayeske was an IAFF employee or an independent contractor.

### B. *Mayeske's Employment Status*

■ The district court held, and the parties do not dispute, that *Holt* states this Circuit's standard for distinguishing between employees and independent contractors in ERISA cases. We agree that *Holt* controls, although the Supreme Court's recent decision in *Community for Creative Non–Violence v. Reid,* ── U.S. ──, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), influences our approach to the *Holt* common-law test.

---

7. The issue that we face here is what preclusive effect we should give an agency's decision in a case separate from the case before this court. This issue differs from the issue of what deference we should give an agency's findings of fact or determinations of law when we review that agency's decision. *Cf. Construction Employees* *Union, Local No. 221 v. NLRB,* No. 899 F.2d 1238, 1241 (D.C.Cir.1990) (according "tempered" deference on review of NLRB decision); *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union v. NLRB,* 603 F.2d 862, 872 (D.C.Cir. 1978) (refusing to extend "any great amount of deference" on review of NLRB decision).

The central issue in *Holt* was when the plaintiff's employee status had commenced for purposes of deciding whether her pension rights had vested. The employer in that case claimed that because it intended that the plaintiff have nonemployee status during her first year of work, the plaintiff was not an employee during that year and did not make progress toward the vesting of her pension rights. This court rejected that claim:

> The simple fact that [the employer] characterized appellant as a contractor did not make her one in the eyes of the law. Rather, the right of one party to control not only the result to be achieved by the other, but also the means and manner of performing the task assigned, is the most critical factor in ascertaining whether an employment relationship exists. Consequently, while all relevant circumstances are to be examined and evaluated, the degree to which English, appellant's supervisor, controlled her daily work activities is the primary consideration in determining her employment status.

*Holt*, 811 F.2d at 1539 (footnotes omitted). In its analysis of "all relevant circumstances," the court drew on the Restatement (Second) of Agency for "other common-law factors," *id.* at 1540, that differentiate between employees and contractors:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or thʌ workman supplies the instrumentalities, tools,

and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Id.* at 1540 n. 54 (quoting Restatement (Second) of Agency § 220(2) (1958)). In applying this test, the court stressed the "control over details" factor. *See id.* at 1539 ("[T]he right of one party to control not only the result ..., but also the means and manner of performing the task assigned, is the most critical factor...."). The court went on to decide that the plaintiff was an employee even in her first year of work and that the period to be used in determining whether her pension rights had vested should include her first year of employment. *See id.* at 1540–41.

The Supreme Court has also recently applied the standards distinguishing employees from independent contractors. *Reid*, 109 S.Ct. at 2166. *Reid* involved a copyright dispute between a sculptor who had prepared a commissioned work and the commissioning organization. The sculptor's claim to copyright ownership depended on whether he was the commissioning organization's employee. *See id.* at 2171–72 (citing 17 U.S.C. § 101(1)). Applying the same common-law test outlined in *Holt*, the Court held that the sculptor was not an employee, but an independent contractor. *Id.* at 2178–79. As the *Reid* Court's analysis makes clear, "the hiring party's right to control the manner and means by which the product is accomplished" deserves separate analysis, *id.* at 2178, but "is not dispositive," *id.* at 2179. The Court found that the sculptor did not control the details of his work, but decided that other facts outweighed this finding. *See id.*[8]

---

**8.** The Court's findings mirrored the Restatement (Second) test:

> Reid is a sculptor, a skilled occupation. Reid supplied his own tools. He worked in his own studio in Baltimore, making daily super-

In the present case, the district court applied the *Holt* test and found that the IAFF "had limited, if any, control over the details, or day to day operations, of plaintiffs' work." *Mayeske*, No. 86–3283, slip op. at 22. After reaching this conclusion, it took up the remaining Restatement (Second) factors, holding that only one of them, the structure of Mayeske's and her staff's compensation, supported the conclusion that Mayeske and her staff were IAFF employees. *Id.* at 22–23. Our review of the record suggests that the court overlooked critical facts when it applied the "control over details" test, and that it erred in its application of the other Restatement factors as well. Thus, we conclude that in this case, in contrast to *Reid*, both the "control over details" test and the other circumstances of Mayeske's work indicate that she was an IAFF employee.

In deciding whether the IAFF controlled the details of Mayeske's work, the district court noted that FEMA's Cooperative Agreements with the IAFF imposed extensive requirements on the Open Learning Program. *See, e.g.,* Federal Emergency Management Agency/National Emergency Training Center Assistance Award (Dec. 3, 1985), J.A. at A680. This fact led the district court to accept the IAFF's portrayal of the Open Learning Program staff as a FEMA contractor occupying space in the IAFF building. *See Mayeske*, No. 86–3283, slip op. at 22. By drawing this conclusion, the court overlooked the point that FEMA contracted with *the IAFF*, not Mayeske and/or her staff. The Cooperative Agreements listed the IAFF as the grant recipient and bore President Gannon's signature. *E.g.,* Assistance Award at 1, J.A. at A680. The IAFF understood the implications of this signature. *See, e.g.,* IAFF Brief at 30

(IAFF paid Mayeske with IAFF checks "because IAFF, as the recipient of the federal funds, was liable for ensuring that those funds were properly administered"). Events have shown that the IAFF bore responsibility for managing FEMA money: when a 1986 audit of the Open Learning Program led FEMA to question $173,678 in expenditures under the Cooperative Agreements, FEMA held the IAFF, not Mayeske, accountable. *See* Letter from Estelle Marr to John Gannon (Jan. 12, 1987), J.A. at A739.

As the 1986 audit illustrates, the Cooperative Agreements' most detailed demands pertained to cost accounting and financial management. *See, e.g.,* FEMA, General Provisions for Grants and Cooperative Agreements §§ 7–8, 10, J.A. at A697–99, A700–02. When it came to specifying the actual work to be done, however, FEMA had no such penchant for detail. *See, e.g.,* Assistance Award ex. A, at 3, J.A. at A689 (outlining such tasks as "[p]rovid[ing] academic and logistical counseling to students throughout the country" and "[p]rovid[ing] support to program liaisons to maintain the OLFSP goals at each network institution"). Thus, we are not persuaded that FEMA exercised day-to-day control over the Program staff or that FEMA's supervision of the IAFF's performance made it impossible for the IAFF to have exercised such control. Detailed guidance from FEMA to the contractor, the IAFF, did not supplant the IAFF's control over a staff that performed the day-to-day task of complying with the Cooperative Agreements.

Although the record does not show how closely the IAFF officers supervised Mayeske's work, we at least know that President Gannon could control Mayeske's at-

---

vision of his activities from Washington practicably impossible. Reid was retained for two months, a relatively short period of time. During and after this time, CCNV had no right to assign additional projects to Reid. Apart from the deadline for completing the structure, Reid had absolute freedom to decide when and how long to work. CCNV paid Reid $15,000, a sum dependent on "completion of a specific job, a method by which independent contractors are often compensated." *Holt v. Winpisinger,* 258 U.S.App.D.C.

343, 351, 811 F.2d 1532, 1540 (1987). Reid had total discretion in hiring and paying assistants. "Creating sculptures was hardly 'regular business' for CCNV." [*Community For Creative Non-Violence v. Reid,*] 270 U.S.App. D.C. [26], at 35, n. 11, 846 F.2d [1485] at 1494 n. 11 [ (1988) ]. Indeed, CCNV is not a business at all. Finally, CCNV did not pay payroll or social security taxes, provide any employee benefits, or contribute to unemployment insurance or workers' compensation funds. *Reid,* 109 S.Ct. at 2179.

tendance at IAFF functions, such as the 1986 convention, and that he reviewed the annual proposals that Mayeske and her staff prepared. *See, e.g.,* Memorandum from B.J. Mayeske to President Gannon (Sept. 22, 1986) (acknowledging Gannon's approval of proposal and asking whether IAFF would continue to sponsor Open Learning Program), J.A. at A793; Memorandum from John A. Gannon to Betty Jo Mayeske (July 2, 1986) ("Cancel all [convention] attendance plans."), J.A. at A754. Gannon's supervision over the proposals suggests considerable practical control over Mayeske. Writing these proposals was one of the most important tasks that Mayeske and her staff performed. Since the proposals formed the basis for each year's Cooperative Agreement, moreover, control over the proposals meant some control over the detailed demands that FEMA made. The district court held that these facts did not show detailed control over Mayeske, and, indeed, that the question of day-to-day control presented no triable issue. We find this holding erroneous.

In light of the facts recounted in this opinion, we also take issue with the district court's conclusion that "of the factors set forth in the Restatement (Second) of Agency, [quoted *supra* p. 1554,] only one, the fact that plaintiffs were paid a salary, weighs in favor of finding an employment relationship." *Mayeske,* No. 86–3283, slip op. at 23. On the contrary, many, perhaps most, of the Restatement (Second) standards indicate that Mayeske and her staff were IAFF employees. The Open Learning Program staff, for example, worked at the IAFF's offices. *See id.* at 6; *see also id.* (IAFF also contributed "nominal amount for supplies and other non-personnel related costs"); *cf.* Restatement (Second) of Agency § 220(2)(e) (1958) ("whether the employer or the workman supplies the instrumentalities, tools, and the place of

work"). When Mayeske became the Open Learning Program's director, she and the IAFF expected the Program to continue for at least five years, subject only to the usual vicissitudes of year-to-year funding. *See* J.A. at 1113 (Mayeske's testimony in NLRB proceeding); *cf.* Restatement § 220(2)(f) ("the length of time for which the person is employed"). Although the IAFF now asserts that Mayeske performed a specialized job that had no strong link to the IAFF's main mission, the IAFF officers said just the opposite to the membership. *See* International Ass'n of Fire Fighters, Officers' Report at 20 ("The Open Learning program is relevant to our purpose of increasing benefits for our members.... We plan to insure that the OLFSP thrives because this project is important to our members and the future of our profession."), J.A. at A406; *cf.* Restatement § 220(2)(h) ("whether or not the work is a part of the regular business of the employer"). Finally, the IAFF hired Mayeske *before* it had any contracts from FEMA or predecessor agencies. It listed itself as Mayeske's employer, and treated her in the same way that it treated other IAFF department heads. These facts suggest that when the IAFF hired Mayeske, both parties believed that Mayeske would be an IAFF employee. *Cf. id.* § 220(2)(i) ("whether or not the parties believe they are creating the relation of master and servant"). In sum, analysis under the Restatement (Second) confirms the result that the "control over details" test suggests: Mayeske and her staff were IAFF employees, working on a long-term IAFF project.[9]

## C. *Effect of the District Court's Employment Status Holding on Other Issues*

The district court has stated alternative grounds for the summary judgment against Mayeske. We decline to review

---

9. Indeed, given the structure of the Open Learning Program, Mayeske and her staff could not have been anything but IAFF employees. As the above analysis demonstrates, they did not act as four FEMA contractors, or as one collective FEMA contractor under Mayeske's direction, because they held no FEMA contracts. *See supra* p. 1555 (IAFF President, not Mayeske, signed

Cooperative Agreements). Nor did the staff act as four independent subcontractors, or one collective subcontractor, under the Cooperative Agreements. The Agreements barred the IAFF from subcontracting "substantive programmatic work" without FEMA's prior approval. General Provisions § 10(d)(2), J.A. at A701.

these alternative holdings, since they all rest on the court's conclusion that Mayeske was not an IAFF employee.

As its most important alternative reason for rejecting Mayeske's claims, the district court concluded that "even if plaintiffs were considered 'employees' of the IAFF within the meaning of ERISA, they would still not qualify as 'participants.'" *Mayeske*, No. 86–3283, slip op. at 24. In its analysis of the participation issue, however, the court explicitly relied on its determination that Mayeske was not an IAFF employee. *See id.* at 23 ("Because plaintiffs were not IAFF 'employees' within the meaning of ERISA, it follows that they were not 'participants' either."); *see also id.* at 19 (noting that under ERISA's definition of "participant," 29 U.S.C. § 1002(7), participants must be employees). In deciding whether Mayeske enjoyed participant status under the terms of the IAFF Staff Representatives' Pension Plan, moreover, the court asked whether the IAFF "employed" Mayeske[10]—an inquiry that involved "many of the same factors" as the court's analysis under *Holt*. *Id.* at 26; *see id.* at 26–27.[11] Given this connection between the court's employment status analysis and its participation analysis, separate review of the holding that Mayeske lacked participant status seems to us imprudent, if not impossible.

For similar reasons, we decline to review the district court's summary judgment against Mayeske on her claims of retaliation, wrongful denial of pension plan documents, and breach of a duty owed to a third-party beneficiary under the Cooperative Agreements. The district court rejected the first two of these claims because of its conclusion that Mayeske was not an IAFF employee or a pension plan participant. *See id.* at 29 ("[B]ecause plaintiffs

were neither employees nor participants within the context of ERISA, they had no 'ERISA rights' to exercise. Hence, the defendant IAFF officers can hardly be said to have violated ERISA section 510, by retaliating against plaintiffs....") (footnote omitted); *id.* at 30 ("[D]efendants had no legal obligation to provide plaintiffs with copies of the IAFF pension plan documents, because plaintiffs were neither participants nor beneficiaries of any of the plans."); *see also id.* at 18–19 (calling participant status a standing requirement under ERISA). The court's holding that Mayeske was not an IAFF employee also accounts for its dismissal of the pendent local-law claims: the court refused to exercise jurisdiction over Mayeske's third-party-beneficiary claims largely because it had rejected Mayeske's ERISA claims. *See id.* at 35.

On remand, the district court should redetermine all of the above issues in light of our reasoning.

## III. CONCLUSION

For the reasons stated above, we hold that Mayeske was an IAFF employee. Since the district court's contrary holding affected all parts of its decision, particularly its conclusion that Mayeske was not a participant in any IAFF pension plan, we vacate the judgment and remand the case to the district court.

*It is so ordered.*

---

**10.** The IAFF Staff Representatives' Pension Plan (Dec. 21, 1976), J.A. at A132, extends participant status to "any Employee in the employ of the Employer who is eligible to participate in the Plan," *id.* § 1.15, J.A. at A139, and defines "Employee" as "any person ... employed by the Employer as either a staff representative or a supervisory employee not covered by a collective bargaining agreement," *id.* § 1.11, J.A. at A138.

**11.** Since the plan does not define "employed by," we see no reason why the common-law definition of "employee," *see Holt*, 811 F.2d at 1538–40, should not control the question whether Mayeske was an "Employee" under the Staff Representatives' pension plan. This conclusion creates a significant overlap between the employment status inquiry and the participation inquiry.