965 F.2d 862
 Leo ROTH, Plaintiff-Appellant,
v.
AMERICAN HOSPITAL SUPPLY CORPORATION; American Precision
Plastics Corporation; a subsidiary of American Hospital
Supply Corporation; American Hospital Supply Corporation
Retirement Trust; Jerry K. Myers; Ralph V. Seaman; Robert
H. Price; Herbert E. Walker; American Hospital Supply
Corporation Retirement Plan; American Hospital Supply
Corporation Employee Incentive Plan and American Hospital
Supply Corporation Stock Ownership Plan, Defendants-Appellees,
American Agronomics Corporation, Cross-Claim Plaintiff and Defendant.
 No. 90-1134.
 United States Court of Appeals,
Tenth Circuit.
 May 27, 1992.
 
 Timothy J. Parsons and David B. Seserman of Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo., for plaintiff-appellant.
 Deana Willingham Dagner and Wendelyn K. Walberg of Walberg, Dagner & Loyd, P.C., Englewood, Colo., for defendants-appellees.
 Before LOGAN and SEYMOUR, Circuit Judges, and WINDER,* District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 Leo Roth appeals from the district court's dismissal of his claims under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq. (1988). He contends that he was an "employee" of American Hospital Supply (Hospital Supply) as contemplated by ERISA, id. at § 1002(6), and that he is therefore entitled to collect that company's pension benefits. The district court, as the trier of fact, held at the close of his evidence that he was not, and that he therefore lacked standing under ERISA. Id. at § 1132. We agree with the district court and affirm.
 
 I.
 
 2
 Mr. Roth became the president and general manager of Precision Plastics Corporation (Precision) in 1967, and he continued to manage it until October 1985. From 1981 on, Precision was a wholly-owned subsidiary, first of American Agronomics Corporation (Agronomics) and later of Hospital Supply. Agronomics agreed to keep Roth on in his previous capacities when it bought Precision in 1981. On March 20, 1981, Roth entered into a five-year employment contract with Agronomics which provided for his continued services as president and chief executive officer of Precision.[1] See Addendum to Answer Brief of Defendant Appellees, Ex. A-8. The contract provided that Roth would receive "employment benefits including ESOP membership" according to Agronomics's general policies. Id.
 
 
 3
 When Agronomics began negotiating with Hospital Supply for the subsequent resale of Precision, Hospital Supply expressed a desire to retain Roth's assistance and services at Precision. The parties reached "something of a standoff," rec., vol. II, at 143, however, over the terms of Roth's employment. Hospital Supply paid its managerial level employees significantly less than Roth was entitled to under his contract; Hospital Supply also did not commit itself to written employment contracts, a condition on which Roth insisted. Mr. Roth was aware that his salary and contract demands could sour the deal, id. at 108, but he nevertheless made it clear that he would not accept employment on Hospital Supply's terms, id. at 108-113. In order to assure the sale, Agronomics broke the impasse by agreeing to continue to honor Roth's contract and to pay him as a "loaned employee" to Hospital Supply. On March 4, 1983, Agronomics and American Scientific Products (a division of Hospital Supply) thus agreed that:
 
 
 4
 "Leo Roth will continue in his status as an employee of American Agronomics Corporation and will be on loan as Plant Manager of American Precision Plastics.... It is agreed that Leo is not an employee of American Precision Plastics Corporation, nor of American Hospital Supply Corporation.... Except for the payments by American Scientific Products for [two disability policies], American Scientific Products will not provide any employee benefits for Leo, including ... pension or profit sharing."
 
 
 5
 Addendum to Answer Brief of Defendant-Appellees, Ex. A-5 at 1 (emphasis added). According to Roth, "American [Hospital Supply] expressly assumed all employment contracts except Roth's," Opening Brief of Plaintiff-Appellant Roth at 2 (emphasis added), and Agronomics retained responsibility for payment of all money owed to him under his employment contract. Id. at 3. While Hospital Supply subsequently agreed to reimburse Agronomics for part of the cost of Roth's contract, it assumed no obligation to Roth at all. Rec., vol. II, at 144.
 
 
 6
 During the remainder of the contract period, Roth continued to manage Precision and to be paid by Agronomics. Indeed, on the one occasion that he received a paycheck from Hospital Supply, he returned it and expressed concern, according to an internal memo at American Scientific Products, that he would be breaching his contract with Agronomics were he to accept a check from any other entity. Addendum to Answer Brief of Defendant-Appellees, Ex. A-2. In September 1985, Roth was informed that his services would not be needed at Precision after the end of the month. While he did no work for Precision after September 30, he continued to be paid by Agronomics until the original contract period ended on March 20, 1986. Roth filed suit under ERISA and the Age Discrimination in Employment Act (ADEA) against Hospital Supply, Precision, and other parties comprising the "Hospital Supply defendants." This appeal arises out of a separate trial ordered by the district court on the sole issue of whether Roth was an employee of any of the defendants.
 
 II.
 
 7
 As a preliminary matter, we see nothing procedurally improper in the district court's dismissal of the case at the close of Roth's evidence.
 
 
 8
 "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant ... may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff."
 
 
 9
 Fed.R.Civ.P. 41(b) (1988) (amended 1991).[2] In such a situation, "the trial court is not required to consider the evidence in the light most favorable to the plaintiff," Blankenship v. Herzfeld, 661 F.2d 840, 845 (10th Cir.1981) (quoting Woods v. North American Rockwell Corp., 480 F.2d 644, 645-46 (10th Cir.1973)), but instead must "undertake[ ] the fact finding process which involves a weighing of the evidence and an assessment of the credibility of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal 'right to relief.' " Feldman v. Pioneer Petroleum, Inc., 813 F.2d 296, 299 & n. 4 (10th Cir.), cert. denied, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). The lower court here acted within its authority in making findings of fact.
 
 
 10
 We review the court's factual determinations under the clearly erroneous standard, id., and will reverse only if we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Upon reviewing the record, we conclude easily that the trial court's findings of such subsidiary facts as Mr. Roth's degree of knowledge and control in the negotiation process were not clearly erroneous. In this circuit, moreover, "the determination of whether an individual is an employee is a question of fact," Marvel v. United States, 719 F.2d 1507, 1515 (10th Cir.1983), and we therefore review the court's finding on that issue as well under the clearly erroneous standard. But see Waxman v. Luna, 881 F.2d 237, 240 (6th Cir.1989) (whether person is employee under ERISA is question of law, since "whenever the trial court arrives at its conclusion by application of statutory law to the facts, such holding becomes a conclusion of law reviewable under the de novo standard"); Penn v. Howe-Baker Eng'rs, Inc., 898 F.2d 1096, 1101 n. 5 (5th Cir.1990) (whether individual is employee or independent contractor under ERISA is a question of law); Holt v. Winpisinger, 811 F.2d 1532, 1536 (D.C.Cir.1987) (same).
 
 
 11
 Congress's use of the term "employee" has been assigned various meanings through time. On this point, ERISA itself "is completely circular and explains nothing," Nationwide Mut. Ins. Co. v. Darden, --- U.S. ----, 112 S.Ct. 1344, 1347, 117 L.Ed.2d 581 (1992), defining an "employee" as "any individual employed by an employer," 29 U.S.C. § 1002(6), and an "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan," id. at § 1002(5). Until recently, the courts of appeal were divided in their attempts to construe this language. Compare Darden v. Nationwide Mut. Ins. Co., 796 F.2d 701, 706-07 (4th Cir.1986), aff'd, 922 F.2d 203 (4th Cir.1991), rev'd, --- U.S. ----, 112 S.Ct. 1344, 117 L.Ed.2d 581 with Mayeske v. Int'l Ass'n of Fire Fighters, 905 F.2d 1548, 1553-1556 (D.C.Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 347, 112 L.Ed.2d 311 (1990); Penn, 898 F.2d at 1101-1102; Holt, 811 F.2d at 1538.
 
 
 12
 The Supreme Court settled this dispute by declaring that in the absence of a clear indication by Congress to the contrary, the common law definition of "employee" is controlling, regardless of the purposes or corrective goals of the statute. Darden, 112 S.Ct. at 1349 (abandoning cases that define employment "in light of the mischief to be corrected and the end to be attained").
 
 
 13
 " '[W]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that the Congress means to incorporate the established meaning of these terms.... In the past, when Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.' "
 
 
 14
 Id. at 1348 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739-40, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811 (1989)); see also Mayeske, 905 F.2d at 1553-1556; Holt, 811 F.2d at 1538. For the purpose of determining whether an individual is an "employee" under ERISA, we therefore begin with the same considerations as if we were determining whether a person were an employee or an independent contractor.
 
 
 15
 The common law analysis requires that a court evaluate all factors relevant to the "hiring party's right to control the manner and means by which the product is accomplished," including:
 
 
 16
 (a) the skill required in the particular occupation;
 
 
 17
 (b) the source of the instrumentalities and tools for the person doing the work;
 
 
 18
 (c) the location of the work;
 
 
 19
 (d) the duration of the work relationship;
 
 
 20
 (e) the hiring party's right to assign additional projects to the hired party;
 
 
 21
 (f) the hired party's discretion over when and how long to work;
 
 
 22
 (g) the method of payment, whether by the time or by the job;
 
 
 23
 (h) the hired party's role in hiring and paying assistants;
 
 
 24
 (i) whether the work is a part of the regular business of the hiring party;
 
 
 25
 (j) whether the hiring party is or is not in business;
 
 
 26
 (k) the provision of employee benefits;
 
 
 27
 (l ) the tax treatment of the hired party.
 
 
 28
 Darden, 112 S.Ct. at 1348. A court may also consider the intent of the parties and their beliefs as to whether they have created the relation of employer and employee. Holt, 811 F.2d at 1540 n. 54 (quoting Restatement (Second) of Agency § 220(2)(i) (1958)). Of these factors, no single one is dispositive, Darden, 112 S.Ct. at 1348; the court must assess the work relationship as a whole.
 
 
 29
 We would have no difficulty deciding this case were the dispute whether Mr. Roth was an employee or an independent contractor, for he was clearly someone's employee. The issue here, however, is one not squarely addressed by the common law test: namely, whose employee was he? Many of the common law factors are, unsurprisingly, inapplicable to this inquiry (e.g., skill required in occupation, hired party's role in hiring assistant, salary rather than hourly rate). Some of the remaining factors, however, demonstrate quite clearly that Roth was indeed an employee of Agronomics for ERISA's purposes. See Bartels v. Birmingham, 332 U.S. 126, 132, 67 S.Ct. 1547, 1551, 91 L.Ed. 1947 (1947) (using common law factors to determine whether orchestra members employed by band leader or dance hall); Professional & Exec. Leasing v. Commissioner, 89 T.C. 225, 232 (1987), aff'd, 862 F.2d 751 (9th Cir.1988).
 
 
 30
 "[I]n the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render services." Bartels, 332 U.S. at 130, 67 S.Ct. at 1550. Roth depended entirely on Agronomics for his salary, and he was paid regardless of Hospital Supply's satisfaction or lack of it with his performance. Any right Hospital Supply may have had to discharge Roth was illusory, given that it lacked economic consequences; Roth continued to collect his salary according to his contract with Agronomics for nearly six months after being told his services were no longer needed at Hospital Supply. While we are fully aware that neither the intent of the parties nor a contract denominating a relationship as one of "employment" will control where the facts themselves do not constitute employment, we nonetheless note that Roth entered into his contract with the express purpose of securing Agronomics's salary and benefits package.
 
 
 31
 In short, when an individual has exercised considerable bargaining power in contract negotiations to obtain a particular compensation package, a court is justified in weighing heavily the parties' beliefs about the type of employment relationship they created. See Penn, 898 F.2d at 1103, n. 9 (intent of parties is "significant factor" in common law analysis). Roth's deliberate and calculated choice to remain under contract with Agronomics instead of accepting the lower salary and better benefits offered by Hospital Supply, his failure to protest or seek legal counsel in the face of Hospital Supply's repeated assertions that he was not an employee, and his continued payment by Agronomics for the full term of his employment contract even after he stopped working for Hospital Supply, fully support the district court's finding that Roth was employed by Agronomics. Factors such as the degree of control exercised by Roth over the details of his work, the status of other individuals performing similar tasks, the degree of skill required in the occupation, the regular business of the company, and the provider of tools, space and materials, are all irrelevant when Roth has effectively waived his right to Hospital Supply's benefit plans by refusing to become its employee. Cf. Laniok v. Advisory Comm., 935 F.2d 1360, 1365-67 (2d Cir.1991) (ERISA does not prohibit knowing and voluntary waiver of right to participate in pension plan).
 
 
 32
 Mr. Roth points to the Ninth Circuit's affirmance of the Tax Court in Professional & Exec. Leasing, 862 F.2d 751, as support for his position that the employer of a "loaned employee" is the entity who receives the services, rather than the person who signs the paychecks and keeps the records. There, Professional & Executive Leasing Company (PEL) paid the salary and benefits of high level "workers" who performed services for "recipient" businesses with whom the workers had prior and continuing relationships. The purpose of this arrangement was apparently to provide higher compensation packages for executive level employees than for other employees at the recipient businesses. The Ninth Circuit agreed with the Tax Court that PEL's retirement plans fell outside the Internal Revenue Code's requirement that such plans be for the "exclusive benefit" of employees, because the "workers" under contract were actually employees of the recipient businesses, not PEL. Mr. Roth argues by analogy that Hospital Supply is a "recipient" business and should be considered his true employer.
 
 
 33
 Professional & Exec. Leasing, however, does not stand for a general proposition that the salary-paying entity is never the legal employer, but rather admonishes us to consider carefully the facts of the relationships in controversy. Unlike PEL's "workers," Mr. Roth depended on the salary-payer, Agronomics, for his income and would presumably have received no salary at all if he had severed his ties to Agronomics. PEL workers, in contrast, used PEL as a convenience but in the event of trouble with PEL, would have been compensated by the recipient businesses as they had been in the past. Professional & Exec. Leasing is also distinguishable from this case, as Defendants indicate, in that PEL's workers never performed any service for PEL itself, they had no relationship with PEL outside or prior to the leasing arrangement, and PEL had no interest, other than as a purveyor of services, in the recipient businesses. In sum, nothing in that case undermines our conclusion that Roth was employed by Agronomics only.
 
 
 34
 Employers should not take either our reasoning or result to mean that they may coerce their employees to waive some part or all of their benefits. ERISA's broad mandate is to protect employees, and the outcome in this case might have been different if there had been any evidence in the record that Hospital Supply pressured Mr. Roth to forego its standard benefits package. In fact, the evidence amply supports the trial court's conclusion that Mr. Roth wanted, for valid short-term economic reasons, to retain the salary/benefits mix offered by Agronomics, and that he was willing to exercise his considerable bargaining strength to ensure this result. Arising as they do from his shrewd manipulation of Hospital Supply's and Agronomics's difficulties, these facts leave us confident that if anything, Mr. Roth took advantage of the companies' weaknesses rather than the reverse.
 
 
 35
 The district court's determination that Roth was not a Hospital Supply employee is not clearly erroneous. We accordingly AFFIRM the district court's dismissal of his claim.
 
 
 
 *
 The Honorable David K. Winder, District Judge, United States District Court for the District of Utah, sitting by designation
 
 
 [1]
 Roth contends that Precision was a party to this contract, and thus that he remained an employee of Precision, rather than Agronomics, throughout the period relevant for this appeal. The district court, however, found otherwise. Rec., vol. II, at 141-42. In light of a later amendment to the contract which referred to the March 20 document as "the employment agreement between [Roth] and American Agronomics Corporation," Addendum to Answer Brief of Defendant-Appellees, Ex. A-9, we think the court's assessment was not clearly erroneous, see Boswell v. Chapel, 298 F.2d 502, 506 (10th Cir.1961). Roth's argument that he was an employee only of Precision, and no other, and that the changes in corporate ownership had no effect on his entitlement to Precision's benefits, accordingly fails
 
 
 [2]
 Effective December 1, 1991, a motion to dismiss an action at the close of the plaintiff's evidence in a bench trial should be treated as a motion for judgment on partial findings as provided in Rule 52(c), as amended. Fed.R.Civ.P. 41(b) Advisory Committee Notes