[No. S102371. Feb. 26, 2004.]

METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
DEWAYNE CARGILL et al., Real Parties in Interest.

CDI CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
DEWAYNE CARGILL et al., Real Parties in Interest.

494

**COUNSEL**

Jeffrey Kightlinger, Herny Torres, Jr.; Horvitz & Levy, Mitchell C. Tilner, Jon B. Eisenberg; Bergman, Wedner & Dacey, Bergman & Dacey, Gregory M. Bergman, Daphne M. Anneet and Mark W. Waterman for Petitioner Metropolitan Water District of Southern California.

Katten Muchin Zavis, Stuart M. Richter, Patricia T. Craigie, Justin M. Goldstein, Donna L. Dutcher; Freedman & Stone and Marc D. Freedman for Petitioners CDI Corporation, Comforce Technical Services, Inc., H.L. Yoh Company, MD Technical Services Company, Peak Technical Services, Superior Technical Resources, Inc., Superior Staffing Services, Inc., Volt Information Sciences, Inc., Volt Management Corp. and Westaff (USA), Inc.

Musick, Peeler & Garrett and Charles E. Slyngstad for County Sanitation District No. 2 of Los Angeles County as Amicus Curiae on behalf of Petitioner Metropolitan Water District of Southern California.

McMurchie, Weill, Lenahan, Lee, Slater & Pearse and David W. McMurchie for California Special Districts Association as Amicus Curiae on behalf of Petitioner Metropolitan Water District of Southern California.

Jones, Day, Reavis & Pogue, Elwood Lui, Philip E. Cook; Brown, Winfield & Canzoneri, Nowland C. Hong and Scott H. Campbell for County of Los Angeles as Amici Curiae on behalf of Petitioner Metropolitan Water District of Southern California.

Myers, Nave, Riback, Silver & Wilson, Arthur A. Hartinger and Terry Roemer for 148 California Cities, Counties, Towns and Districts, California Association of Sanitary Agencies, State Water Contractors, California Special Districts Association and Association of California Water Agencies as Amici Curiae on behalf of Petitioner Metropolitan Water District of Southern California.

No appearance for Respondent.

Cochran-Bond Connon & Ben-Zvi, Cochran-Bond Law Offices, Walter Cochran-Bond; Law Offices of William M. Samoska, Samoska & Friedman, Judy A. Friedman and Richard N. Grey for Real Parties in Interest Dewayne Cargill, Anvar Alfi, John Sims, Paul Broussard, Joseph Zadikany, Sun Son, Charlotte Manuel, Steven Minor and Lisa Nelson.

Steptoe & Johnson, Edward Gregory, Sheri T. Cheung, Jason Levin and Bennett Cooper for Real Party in Interest California Public Employees' Retirement System.

Rothner, Segall & Greenstone, Anthony R. Segall, Glenn Rothner and Julia Harumi Mass for American Federation of State, County and Municipal Employees Union, Local 1902, AFL-CIO as Amicus Curiae on behalf of Real Parties in Interest.

Bendich, Stobaugh & Strong, David F. Stobaugh, Stephen K. Strong, Brian J. Waid; Krakow & Kaplan, Rottman • Kaplan, Steven J. Kaplan; Kalisch, Cotugno & Rust, Lee Cotugno and Mark Kalisch as Amici Curiae on behalf of Real Parties in Interest.

Carol R. Golubock and Patricia C. Howard for Service Employees International Union, AFL-CIO, CLC as Amicus Curiae on behalf of Real Parties in Interest.

Davis, Cowell & Bowe, Richard G. McCracken and Andrew J. Kahn for Union of American Physicians and Dentists as Amicus Curiae on behalf of Real Parties in Interest.

Tosdal, Levine, Smith, Steiner & Wax and Thomas Tosdal for Center on Policy Initiatives as Amicus Curiae on behalf of Real Parties in Interest.

## OPINION

**WERDEGAR, J.**—(1) Defendant Metropolitan Water District of Southern California (MWD) contracts with the California Public Employees' Retirement System (CalPERS) for the latter to provide retirement benefits to MWD's employees. The single issue of law presented here is whether, under the Public Employees' Retirement Law (PERL) (Gov. Code, § 20000 et seq.)[1] and MWD's contract with CalPERS, MWD is required to enroll in CalPERS all workers who would be considered MWD's employees under California common law. MWD contends it may exclude from enrollment workers, such as plaintiffs, who are paid through private labor suppliers, even if they would be employees under the common law test. We conclude, as did the lower courts, that the PERL incorporates common law principles into its definition of a contracting agency employee and that the PERL requires contracting public agencies to enroll in CalPERS all common law employees except those excluded under a specific statutory or contractual provision.

We understand, as MWD argues, that public employers must occasionally hire additional workers for projects lasting an extended period of time and that, in some cases, enrolling those workers in CalPERS may involve a

---

[1] Hereafter all statutory references are to the Government Code unless otherwise indicated.

needless expense. But while many temporary workers (generally, those employed for no more than six months at a time or 125 days in a fiscal year) are excluded from CalPERS (§ 20305, subd. (a)(3)), the PERL contains no broad exclusion for long-term, full-time workers hired through private labor suppliers. Any change in the PERL to accommodate such long-term temporary hiring must come from the Legislature, not from this court, which cannot remake the law to conform to MWD's hiring practices. Moreover, although the PERL permits participating agencies to seek agreement from CalPERS for exclusion of selected categories of employees (§ 20502), MWD has not negotiated an exception to its CalPERS contract for its long-term project workers. Again, this court is not empowered to remake the parties' agreement even were we of the view that such an amendment would be desirable.

The present writ proceeding, which arises from the trial court's pretrial decision on a single legal issue in this complex litigation, presents only the question of whether the PERL requires enrollment of all common law employees. We therefore do not decide whether plaintiffs are in fact common law employees of MWD, nor do we express any opinion as to whether plaintiffs, in the event they are determined to be MWD's employees as defined in the PERL, are therefore entitled to enrollment in CalPERS as of the dates they were first employed. Still less do we decide whether plaintiffs are MWD's employees for any purpose other than CalPERS enrollment or whether they are entitled to any benefits as employees under other provisions of law.

FACTUAL AND PROCEDURAL BACKGROUND

MWD, a public agency engaged in procuring, storing, and delivering water, hires and employs many employees under a merit system set forth in its administrative code, which establishes procedures for the selection of employees and provides those employees with various benefits; these recognized employees are also enrolled in CalPERS retirement plans pursuant to the MWD-CalPERS contract. In addition, however, MWD has entered into contracts with several private labor suppliers to provide it with workers. MWD classifies these workers as "consultants" or "agency temporary employees" and neither enrolls them in CalPERS retirement plans nor provides them with benefits specified in the MWD administrative code.

Plaintiffs are named individual workers hired through labor suppliers, and a proposed class of such workers, who allege MWD misclassified them as consultants and agency temporary employees and for that reason illegally denied them the ordinary benefits of MWD employment, including CalPERS

enrollment.[2] Plaintiffs' petition and complaint sought writ relief compelling MWD to provide class members with compensation, benefits, and employment rights in accordance with the agency's administrative code and, in particular, to enroll class members in CalPERS.

Plaintiffs also named as defendants several of MWD's labor suppliers, alleging they had violated the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) by assisting MWD to avoid its statutory obligations to plaintiffs; plaintiffs sought injunctive relief and other equitable remedies on this cause of action. The trial court permitted CalPERS to intervene in the action; its complaint seeks a declaration that the PERL requires enrollment of all MWD's common law employees not specifically excluded by statute or the MWD-CalPERS contract.

In a case management order, the trial court identified the following question, labeled "Issue A," for pretrial resolution: "Whether MWD is mandated by the [PERL] to enroll all common law employees in CalPERS." After extensive briefing and argument on MWD's motion for summary adjudication and CalPERS's motion for decision, both concerning Issue A, the court ruled that MWD is mandated by the PERL to enroll all common law employees in CalPERS.

MWD and the labor suppliers sought review in the Court of Appeal by petition for writ of mandate. The Court of Appeal, after issuing an order to show cause, denied the petition by opinion, holding the trial court had resolved Issue A correctly. We granted MWD's and the labor suppliers' petitions for review.

The issue upon which we granted review is a purely legal one that can be decided without exploring the details of plaintiffs' relationship with MWD and the labor suppliers. Suffice it to say that plaintiffs alleged, and have produced some evidence to show, that they worked at MWD for indefinite periods, in some cases several years; that MWD managers interviewed and selected them for employment; that they were integrated into the MWD workforce and performed, at MWD offices or worksites, duties that are part of MWD's regular business; that MWD supervisors directly oversaw and evaluated their work, determined their hourly rates of pay, raises, and work schedules, approved their timesheets, and had the power to discipline and

---

[2] Plaintiffs also include some individuals who allegedly were hired directly by MWD but misclassified as "district *temporary* employees" and, for that reason, have been denied the ordinary benefits of MWD employment. The complaint does not make clear whether these plaintiffs have also been denied CalPERS enrollment. The parties' contentions on the single issue before us, entitlement to CalPERS enrollment, have focused solely on those plaintiffs hired through labor suppliers; our discussion will therefore do the same.

terminate them; and in general that MWD had the full right to control the manner and means by which they worked, while the labor suppliers merely provided MWD with "payroll services." Such facts, if proven, might support an argument that plaintiffs are MWD's employees under the established common law test (see *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943 [88 Cal.Rptr. 175, 471 P.2d 975]; Rest.2d Agency, § 220), which is used by CalPERS administrators to distinguish employees from independent contractors.[3] But these allegations, which MWD has denied for lack of knowledge or information, have not yet been tried.

## DISCUSSION

Under the PERL, the CalPERS system covers not only state employees but also employees of "contracting agencies," that is, public entities, such as MWD, that have chosen to participate in CalPERS by contract with the CalPERS governing board. (§§ 20022, 20460.)

A CalPERS "member"—the status to which plaintiffs claim they are entitled—is an "employee who has qualified for membership in this system and on whose behalf an employer has become obligated to pay contributions." (§ 20370, subd. (a).) More specifically, "local miscellaneous members" include "all employees of a contracting agency who have by contract been included within this system, except local safety members." (§ 20383.)[4] Under section 20281, a person hired as an employee of the state or a contracting agency "becomes a member upon his or her entry into employment." As these provisions indicate, only an agency's *employees*—not those performing services for the agency on other terms—may be enrolled in CalPERS. The PERL makes this rule explicit in section 20300, subdivision (b), which excludes from CalPERS membership "[i]ndependent contractors who are not employees."

The contract between a participating agency and CalPERS may exclude some of the agency's employees, but "[t]he exclusions of employees . . . shall be based on groups of employees such as departments or duties, and not on

---

[3] MWD argues that CalPERS has not historically applied the common law test to leased workers, and one of the minority opinions accuses CalPERS of "misleading procrastination" in this respect. (Dis. opn. of Baxter, J., *post*, at p. 521.) But CalPERS insists it has done so consistently from as early as 1944, when MWD first sought to join the system, and cites three occasions on which it determined that leased workers were in fact employees under the common law test. Unlike the dissent, we decline to express an opinion on CalPERS's conduct, a matter that *is simply not before us*. Resolution of the sole question presented—whether MWD is obliged to enroll all its common law employees—does not depend on CalPERS practices.

[4] According to the complaint, none of the plaintiffs are safety employees, who are excluded under the MWD-CalPERS contract.

individual employees." (§ 20502.) Furthermore, the CalPERS board may disapprove a contract amendment proposing an exclusion "if in its opinion the exclusion adversely affects the interest of this system." (*Ibid.*) Finally, employees of contracting agencies may not decline membership for which they qualify: "Membership in this system is compulsory for all employees included under a contract." (*Ibid.*) The MWD-CalPERS contract follows the above provisions of section 20502; it states that all "[e]mployees other than local safety members" shall become members of CalPERS unless excluded by law or by the agreement, and excludes only a single group, "safety employees."

The above establishes that both under the provisions of the PERL, to which MWD. became subject when it entered into its contract with CalPERS (§ 20506), and under the contract itself, MWD is obliged to enroll in CalPERS all its employees other than safety employees and those, such as certain part- time and temporary employees (§ 20305), excluded by the PERL. Our question, then, is what the PERL means by "employee."

As to contracting agencies, the PERL gives the term no special meaning, stating simply that "employee" means "[a]ny person in the employ of any contracting agency." (§ 20028, subd. (b).) In this circumstance—a statute referring to employees without defining the term—courts have generally applied the common law test of employment. " '[W]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.' [Citations.] *In the past, when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." (Community for Creative Non-Violence v. Reid* (1989) 490 U.S. 730, 739–740 [104 L.Ed.2d 811, 109 S.Ct. 2166], italics added; accord, *People v. Palma* (1995) 40 Cal.App.4th 1559, 1565–1566 [48 Cal.Rptr.2d 334] ["as a general rule, when 'employee' is used in a statute without a definition, the Legislature intended to adopt the common law definition and to exclude independent contractors"].) California courts have applied this interpretive rule to various statutes dealing with public and private employment.[5] The federal courts have

---

[5] See, e.g., *Tieberg v. Unemployment Ins. App. Bd., supra,* 2 Cal.3d at pages 946–950 (unemployment insurance law); *McFarland v. Voorheis-Trindle Co.* (1959) 52 Cal.2d 698, 702–706 [343 P.2d 923] (workers' compensation exclusivity); *Service Employees Internat. Union v. County of Los Angeles* (1990) 225 Cal.App.3d 761, 769–770 [275 Cal.Rptr. 508] (public employment collective bargaining law).

applied it specifically to the question of qualification for retirement benefits.[6] Unless given reason to conclude the Legislature must have intended the term to have a different meaning in section 20028, subdivision (b), we also can only adhere to the common law test. We proceed to consider MWD's and the labor suppliers' arguments for a contrary reading of the PERL.

Observing that the PERL should be read as a whole, MWD points to several provisions of the law that, it contends, show the legislative intent that a contracting agency's worker is to be covered *only if the funds from which the worker is paid are controlled by the agency*, a criterion it asserts plaintiffs do not meet because their paychecks were issued by the labor suppliers, not MWD. We agree the provisions of the PERL should be read in the context of the entire law. (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034].) For the reasons stated below, however, we do not agree that only those on the MWD payroll may be considered MWD employees for purposes of enrollment in CalPERS.

While subdivision (b) of section 20028, concerning employees of *contracting* agencies, contains no control-of-funds limitation, subdivision (a) of the same statute, concerning employees of *state* agencies, does; subdivision (a) defines "employee," in relevant part, as "[a]ny person in the employ of the state . . . whose compensation . . . is *paid out of funds directly controlled by the state* . . . excluding all other political subdivisions, municipal, public and quasi-public corporations." (Italics added.)[7]

MWD contends subdivision (b) of section 20028 should be read as containing the same control-of-funds limitation as section 20028, subdivision (a) because, prior to the PERL's 1945 codification, the provisions of the

---

[6] *Nationwide Mutual Insurance Company v. Darden* (1992) 503 U.S. 318, 322–323 [117 L.Ed.2d 581, 112 S.Ct. 1344] ("employee," as used in Employee Retirement Income Security Act (ERISA), is defined by the common law test); see *Wolf v. Coca-Cola Company* (11th Cir. 2000) 200 F.3d 1337, 1340–1342 (leased worker may be employee, under common law test, for purposes of ERISA, but is not entitled to benefits because specifically excluded by terms of employer's plan); *Vizcaino v. United States District Court for the Western District of Washington* (9th Cir. 1999) 173 F.3d 713, 723–724 (Restatement test applied to determine whether temporary agency employees were employees of Microsoft for purposes of participation in Microsoft's employee stock purchase plan).

[7] Section 20028, subdivisions (a) and (b) provide in full: " 'Employee' means all of the following: [¶] (a) Any person in the employ of the state, a county superintendent of schools, or the university whose compensation, or at least that portion of his or her compensation that is provided by the state, a county superintendent of schools, or the university, is paid out of funds directly controlled by the state, a county superintendent of schools, or the university, excluding all other political subdivisions, municipal, public and quasi-public corporations. 'Funds directly controlled by the state' includes funds deposited in and disbursed from the State Treasury in payment of compensation, regardless of their source. [¶] (b) Any person in the employ of any contracting agency."

two present subdivisions were part of a single paragraph; no reason exists for the Legislature to have required direct agency control in one case (state agencies) but not in the other (contracting agencies); and to make such a distinction would violate the constitutional equal protection rights of any state agency workers excluded from CalPERS because they are paid from funds not directly controlled by the state.

We find these arguments unpersuasive. As the Court of Appeal explained, "[w]here the Legislature makes express statutory distinctions, we must presume it did so deliberately, giving effect to the distinctions, unless the whole scheme reveals the distinction is unintended." Here, every indication is that the distinction was purposeful. Though the precodification version of the law contained provisions regarding state agencies and contracting cities in the same paragraph, indeed the same sentence, that text, like the two subdivisions today, nonetheless clearly distinguished between the two categories of employees and imposed a direct-control-of-funds limitation only as to employees of state agencies.[8] The legislative intent to make this distinction, shown by the plain language of section 20028 and its predecessors, is confirmed by other parts of the PERL permitting state employees who are reassigned to positions in which their compensation does *not* come from a source directly controlled by the state nevertheless to continue to participate in CalPERS. (§§ 20284, 20772; cf. § 21020, subd. (d).) These provisions, like the limitation on employment in section 20028, apply only to employment by the state, not by a contracting agency, strongly suggesting the distinction in section 20028 was not accidental.

A rational legislative basis for the distinction is, moreover, readily apparent. The direct-control-of-funds limitation in subdivision (a) of section 20028 prevents local government employees working in programs indirectly funded by the state from claiming state employment. (See, e.g., *Adcock v. Board of Administration* (1979) 93 Cal.App.3d 399, 402–403 [155 Cal.Rptr. 596] [under predecessor to § 20028, subd. (a), inheritance tax referee paid from state tax revenues controlled by county treasurer is not eligible for CalPERS state service credit].) Contracting agencies, unlike the state, are not typically engaged in indirect funding of other government entities' programs, and a contracting agency, also unlike a state agency, may seek exclusion, under section 20502, of categories of employees not paid out of funds directly controlled by the agency. MWD's claim that the distinction in section 20028 between state and contracting agency employees must have been a drafting error resulting from the creation of two subdivisions from a single statutory

---

[8] See Statutes 1939, chapter 927, section 3, pages 2605–2606, defining an employee as "any person in the employ of the State of California whose compensation . . . is paid out of funds directly controlled by the State . . . and, for the purposes of this act, any person in the employ of any contracting city who is included by contract under the retirement system."

paragraph is therefore without merit, as is its claim that the distinction violates equal protection principles because it lacks a rational basis.

MWD also argues that failing to read a control-of-funds limitation into section 20028, subdivision (b) will have the absurd and burdensome consequence of enrolling thousands of contracting agency workers in CalPERS with no prospect those employees will ever receive retirement benefits. This claim rests on the PERL provisions arguably basing the amount of retirement benefits upon compensation paid from funds controlled by the employing agency. (See §§ 21354 [benefits for local miscellaneous members determined in part from member's "final compensation"], 20069, subd. (a) ["state service" is service "for compensation"], 20630 ["compensation" is "remuneration paid out of funds controlled by the employer"].)

As CalPERS points out, however, other provisions of the PERL may permit retirement benefits to be calculated on a basis not formally dependent on state or contracting agency employer control of funds. (See §§ 20024 [service credit available for "service in employment while not a member but after persons employed in the status of the member were eligible for membership" as well as for "state service"], 20037 ["final compensation" dependent on member's "compensation earnable"], 20636 ["compensation earnable" dependent on member's "payrate" and "special compensation," both defined without reference to employer control of funds].) We agree with the Court of Appeal that "MWD has not established that the sections it cites constitute the only tests for determining benefit levels."

█ More to the point, the PERL's enrollment mandate is separate from the right to collect retirement benefits. A contracting agency must enroll all employees who are not excluded from the system by law or contract. (§ 20502; see also § 20281 [new contracting agency employee "becomes a member upon his or her entry into employment"].) The right of any member to receive benefits, on the other hand, is in the first instance for CalPERS itself to decide, after hearing if necessary, when such benefits are sought. (§§ 20123, 20125, 20134.) Even if, as MWD claims, service credit and final compensation are dependent on whether the contracting public agency controlled the funds from which the employee was paid, CalPERS correctly claims the authority to determine, subject to judicial review, "the existence, level and effect of such control following evidentiary hearings" on entitlement to benefits. In a given case, CalPERS may well determine that an employee whose paycheck was issued by a private labor supplier, but whose rate of pay and hours of work were set by the employing contracting agency, whose timesheets were subject to approval by that agency's supervisors, and for whose work the labor supplier was paid an amount calculated from the agency-dictated pay rate (all of which, the record suggests, were true of at

least some plaintiffs here), was compensated from funds controlled, within the meaning of section 20630, by the contracting public agency. (See *People v. Groat* (1993) 19 Cal.App.4th 1228, 1232–1234 [24 Cal.Rptr.2d 15] [local government manager who approved her own timesheets thereby controlled disbursement of public funds within meaning of criminal misappropriation statute]; *People v. Qui Mei Lee* (1975) 48 Cal.App.3d 516, 519, 523 [122 Cal.Rptr. 43] [same, as to county medical director with authority to approve invoices from private hospitals, which were actually paid by county auditor].)[9]

■ No absurd or obviously unintended result is necessarily created, therefore, by reading section 20028, subdivision (b) according to its plain language, as not containing the direct-control-of-funds limitation found in section 20028, subdivision (a). To the contrary, it is MWD's interpretation of the statute, under which a public agency employee paid through a third party would automatically be disqualified from CalPERS membership, that would undermine the legislative purpose of the PERL. As the trial court cogently observed in its Issue A ruling, MWD's construction "would allow . . . contracting agencies to unilaterally avoid their enrollment obligations by setting up a variety of third-party wage and benefit mechanisms, or by bypassing internal merit hiring systems, both of which appear inconsistent with the legislative requirement in section 20502 that contracting agencies must enroll all employees absent a statutory exclusion or a contractually agreed upon exclusion expressly approved by the CalPERS Board."

MWD also makes two related public policy arguments for construing the PERL to exclude workers hired through labor suppliers: first, MWD observes that if such workers are hired without going through the agency's normal merit selection procedures (in MWD's case, set out in its administrative code), but can obtain full employee benefits, merit selection programs will be undermined; and second, MWD argues that public agencies often need temporary workers solely for individual public works projects, which may take years to complete, and that giving such employees full civil service

---

[9] Justice Baxter argues this court should decide as a matter of law that plaintiffs are ineligible for CalPERS membership because that the labor suppliers issued their paychecks is undisputed. (Dis. opn. of Baxter, J., *post*, at p. 525, fn. 5.) This analysis assumes that the entity issuing a paycheck necessarily has sole control (within the meaning of the PERL) of the funds from which the worker is paid. But as experience and the decisions cited above indicate, control over disbursement of funds may be exercised by persons other than those who actually write the checks. MWD's asserted control over whether, how long, and at what wages its leased employees work might well be sufficient to constitute control over the funds from which they are paid, funds that MWD supplies through its payments to the labor suppliers. Because the degree and nature of the control exercised by MWD is a matter of disputed fact (see *ante*, at pp. 498–499), so far unresolved either by trial or by CalPERS hearing, the legal question of how much control is enough is not ripe for decision.

rights, including restrictions on discharge, will result in unnecessarily increased public staffing costs.

■ MWD tethers neither argument to provisions of the PERL, and we are aware of nothing in the PERL to support an exclusion based on either rationale. Participation in the CalPERS retirement system does not depend on whether an agency chooses to classify an employee as eligible for benefits under civil service or local merit selection rules. Such an interpretation could lead, contrary to the letter and spirit of the law, to a patchwork of standards set by local agencies rather than a uniform definition set and applied by the CalPERS administering board. (See §§ 20125 [CalPERS board has sole authority to "determine who are employees"], 20502 [board may disapprove agency proposal to exclude a group of employees]; *City of Los Altos v. Board of Administration* (1978) 80 Cal.App.3d 1049, 1051–1052 [144 Cal.Rptr. 351] [legislative intent was for a single system-wide standard of eligibility, not various standards set by individual participating agencies]; see also Com. on Pensions of State Employees, Rep. to Leg. (Dec. 1928) p. 10 [proposed state pension law "has been drawn on the assumption that all state employees shall participate in the system, without regard to whether or not they have civil service status"].) ■ Nor, given the express exclusion of "seasonal, limited-term . . . or other irregular" workers who are employed for fewer than six months at a time or 125 days (or 1,000 hours) in a fiscal year (§ 20305, subd. (a)(3)), can we infer an intent to exclude, more broadly, all workers hired for a long-term public works project.

Though we cannot rewrite the PERL to relieve MWD of the consequences it foresees from application of the law to its employment practices, MWD itself seemingly has the power to avoid at least some of them. As CalPERS observes, "[i]t was MWD who chose to hire [plaintiffs] through the providers instead of through its own merit selection system." If, as it claims, MWD fears "favoritism, cronyism and political patronage" will result from giving workers hired outside the merit selection system employee status, the agency retains the option of applying its merit selection system more broadly to avoid these evils.

■ To the extent MWD complains of having to provide long-term project workers the employment security and other benefits provided for in its administrative code, we stress that no such result follows from our plain language reading of the PERL: a determination that long-term project workers are entitled to enrollment in CalPERS would not necessarily make those workers permanent employees for purposes of MWD's administrative code or entitle them to benefits provided by MWD to its permanent employees.[10] For

---

[10] We say nothing here, of course, regarding plaintiffs' entitlement, or lack thereof, to the MWD administrative code benefits sought in their petition and complaint. Only the issue of the PERL's interpretation is before us.

both past and present workers, entitlement to local agency benefits is a wholly distinct question from entitlement to CalPERS enrollment and, as to MWD's future hires, of course, nothing in the PERL prevents it from amending its own code.

The private labor suppliers, citing several statutes and regulations that permit dual employers of the same worker (joint employers or coemployers) to share or allocate between them certain responsibilities of employment, argue the PERL, too, should be construed to recognize coemployment. They maintain that under a theory of coemployment the labor suppliers, rather than their clients such as MWD, should be deemed the employers for purposes of the PERL, thus excluding workers they supply from the public retirement system. No legitimate basis exists, however, for finding a coemployment exception to the PERL.

█ The cited laws may be fairly read as showing a recognition of leased workers as a special case in certain contexts.[11] But none purports to abrogate the common law test for employment, and none suggests that workers hired through labor suppliers are, for purposes other than those treated by the cited statutes, deemed employees only of the labor supplier. Nor, of course, has the Legislature provided in the PERL for any coemployment exception to a contracting agency's duty to enroll employees in CalPERS. The only relevant legislative choice to date has been to require enrollment of all persons in the "employ" of a contracting agency. (§ 20028, subd. (b).) Where the Legislature has expressly provided for separation of certain payments and benefits (workers' compensation and unemployment insurance) from employment as defined at common law, but has not done so for public retirement benefits, the court may not write such an omitted exception into the PERL statutes. As the Court of Appeal explained, "such revision is a legislative, not a judicial, responsibility."

---

[11] See, e.g., Labor Code section 3602, subdivision (d) (where a worker has multiple employers, one employer may contract with another for the payment of workers' compensation premiums and may thereby satisfy its statutory duty to secure compensation); Unemployment Insurance Code section 606.5 (if labor supplier meets definition of "leasing employer"—a supplier who also determines the workers' assignments and rates of pay and has the right to hire and fire the workers—supplier is the employer for purposes of securing unemployment insurance; otherwise, the "client or customer" remains the employer for unemployment insurance purposes); California Code of Regulations, title 2, section 7286.5 (for purposes of Fair Employment and Housing Act, worker supplied through temporary services agency is employee of temporary services agency "with regard to such terms, conditions and privileges of employment under the control of the temporary service agency," but is employee of client employer as to "such terms, conditions and privileges of employment under the control of that employer").

No more persuasive is the labor suppliers' claim that a worker hired through a supplier *waives* his or her right to CalPERS membership by agreeing to be hired in this manner. Contrary to the suppliers' assertion that "[n]othing in PERL indicates participation is mandatory," the PERL states in so many words that "[m]embership in this system is compulsory for all employees" not excluded by other provisions of the PERL or by the local agency's contract with CalPERS. (§ 20502; see also § 20281 [employee of state or contracting agency becomes a member upon entry into employment].) That rule protects the system itself, for, as the commission that initially recommended establishment of a state pension system explained, without mandatory membership some employees may prefer to take their full salary and, absent the prospect of a pension, will be reluctant to retire even when they are no longer productive: "The state can secure full value for the money it contributes only through compulsory membership of all employees. One employee should have no more right than another to continue at full salary far beyond the period of full working efficiency." (Com. on Pensions of State Employees, Rep. to Leg., *supra*, p. 10; accord, *State Civil Service*, 22 Ops.Cal.Atty.Gen. 205, 206 (1953) [benefits under the PERL are established for a public reason and may not be waived by private agreement].)[12]

None of the federal decisions cited by the labor suppliers and the concurring and dissenting opinion (*Roth v. American Hospital Supply Corp.* (10th Cir. 1992) 965 F.2d 862; *Hockett v. Sun Company, Inc.* (10th Cir. 1997) 109 F.3d 1515; *Capital Cities/ABC, Inc. v. Ratcliff* (10th Cir. 1998) 141 F.3d 1405) is to the contrary. The *Roth* court relied expressly on authority holding, under ERISA, that participation in a pension plan may be knowingly and voluntarily waived (*Roth v. American Hospital Supply Corp., supra*, at p. 867); under the PERL, as stated, membership is compulsory for eligible employees of contracting agencies. Roth, moreover, was not an ordinary leased worker but a chief executive officer who, in negotiations over sale of his company, *insisted* that he continue to be employed by the former parent company. The court limited its waiver holding to those facts, noting that "[e]mployers should not take either our reasoning or result to mean that they may coerce their employees to waive some or all of their benefits." (*Id.* at

---

[12] In a variation on the waiver theory, Justice Baxter argues that because plaintiffs "decided" to be employed through labor suppliers, they should have no right to benefits ordinarily available to MWD employees. (Dis. opn. of Baxter, J., *post*, at p. 525.) But the record suggests plaintiffs were given no choice in the matter. The named plaintiffs' declarations generally indicate they were interviewed and selected by MWD supervisors and *told* their employment would be through a labor supplier. The dissent cites no evidence plaintiffs freely chose to avoid "the rigors of a competitive merit selection system." (*Ibid.*) All that plaintiffs "decided" was to accept employment on the terms offered. In contrast, MWD, exercising apparently unfettered freedom of choice, decided to hire plaintiffs without using the procedures set forth in its administrative code. If any unfairness to other employees results from that decision, it should not be attributed to plaintiffs.

p. 868.) The *Hockett* court applied the common law test for employment; to the extent it gave particular emphasis to the parties' understanding of their relationship, one of the established factors, it relied on its earlier decision in *Roth*. (*Hockett v. Sun Company, Inc., supra*, at p. 1527.) Finally, in *CapitalCities/ABC, Inc. v. Ratcliff*, the same court held simply that the employees had, by express contract, waived their rights to pension benefits. (*CapitalCities/ABC, Inc. v. Ratcliff, supra*, at p. 1410.) As already explained, such contractual waivers are not recognized under the PERL.

The concurring and dissenting opinion argues "it should be for the Legislature, not this court," to decide "whether a public agency should be permitted to use leased workers to meet its labor needs." (Conc. & dis. opn. of Brown, J., *post*, at p. 513.) We absolutely agree. Nothing we say here precludes the Legislature, if it so chooses, from amending the PERL to declare leased workers to be the employees of the labor suppliers, as the Legislature in fact has done for certain (but, notably, not all) labor suppliers in the unemployment insurance context. (Unemp. Ins. Code, § 606.5.) But for this court to anticipate legislative action and create an unprecedented exemption from the PERL by replacing the established common law test of employment with a rule of complete deference to the parties' characterization of their relationship (conc. & dis. opn. of Brown, J., *post*, at pp. 513, 515–516) would be, we believe, improper, especially as the issue here is one of *statutory interpretation*, not of common law development. Convinced the common law test must be rewritten so as to serve the "labor consumer['s]" purpose of "separat[ing] control from other terms of employment," the concurring and dissenting justice excoriates the court for failing to reach out to embrace this "new labor paradigm." (*Id.*, at pp. 513, 517.)[13] But we believe the court exercises restraint consistent with the "[p]roper exercise of our role" and fully discharges its "fundamental obligation" (*Id.*, at pp. 510, 520) by deciding the single statutory question presented under the procedural posture of this case, Issue A of the case management order, without exploring common law issues neither decided by the lower courts nor briefed by the parties.

---

[13] Even if we could properly reach the question of a "new labor paradigm" in this case—despite the lack of even a hint of this idea in the statute at issue—we would not necessarily be convinced this case calls for a fundamentally new understanding of the employment relationship. MWD, a large public employer, is already well organized to assume the risks and burdens of the employment relationship for its scores or hundreds of employees. If the allegations in plaintiffs' complaint are true, MWD may have hired plaintiffs through labor suppliers not to reduce the burden on its human resources department, but to avoid providing them retirement and other employment benefits.

CONCLUSION

In sum, we conclude the PERL's provision concerning employment by a contracting agency (§ 20028, subd. (b)) incorporates a common law test for employment, and that nothing elsewhere in the PERL, in MWD's administrative code, or in statutes and regulations addressing joint employment in other contexts supports reading into the PERL an exception to mandatory enrollment for employees hired through private labor suppliers.

Justice Baxter claims our decision will impose a "crushing burden" on MWD and other contracting agencies by requiring them to make up previously unpaid CalPERS contributions for leased workers. (Dis. opn. of Baxter, J., *post*, at p. 521.) As previously stated (see *ante*, at p. 497), however, we do not hold that plaintiffs or any other particular leased workers must be enrolled in CalPERS; nor do we hold that plaintiffs, if found to be MWD employees, must be enrolled as of their dates of initial employment. Moreover, as Justice Baxter himself recognizes (dis. opn. of Baxter, J., *post,* at pp. 523–524), employees with fewer than five years in qualifying service— presumably including most employees hired as temporary workers through labor suppliers—are ineligible for CalPERS retirement benefits, and a contracting agency's contribution obligations are determined actuarially, taking into account the employer's eligibility experience. (See §§ 20815, subd. (a), 21060.) Contributions attributable to temporary leased employees should thus be substantially reduced. Finally, pursuant to section 20812, the CalPERS board may adopt a funding period of 30 years for amortization of unfunded contributions from contracting agencies and "shall approve new amortization periods based upon requests from contracting agencies . . . that can demonstrate a financial necessity," making the imposition of ruinous lump-sum liability even more unlikely. In short, Justice Baxter greatly overstates the effect of the court's decision.

DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., and Moreno, J., concurred.

**BROWN, J.,** Concurring and Dissenting.—This is a case of the tail wagging the dog—with a vengeance. The majority purports to decide only whether real parties in interest[1]—workers leased by the Metropolitan Water

---

[1] In the action below, real parties in interest were the plaintiffs and respondent Metropolitan Water District was the defendant. For clarity, I will refer to the parties by these terms.

District (MWD) from independent labor suppliers—must be enrolled as members of the California Public Employees' Retirement System (CalPERS). In reality, the majority has uncritically applied an arguably obsolete common law definition of "employee" to a new labor paradigm and conferred an authority on CalPERS—one never accorded by the Legislature—to unilaterally determine the legality of public employers using leased workers. Proper exercise of our role in defining the common law and according deference to the legislative and executive branches should compel the court to decline plaintiffs' invitation to remake the civil service in the image of the pension system. I respectfully dissent.

## I.

In its extensive case management order, the trial court considered threshold "Issue A": "Whether [MWD] is mandated by the [Public Employees' Retirement Law] to enroll all common law employees in CalPERS." Plaintiffs reason that, under California's common law definition of "employee," they are unquestionably MWD employees. Therefore, if the Public Employees' Retirement Law (PERL) incorporates the common law test into its own definition of "employee," plaintiffs are entitled to CalPERS enrollment.

The trial court permitted CalPERS to file a complaint in intervention. Consistent with plaintiffs' interpretation, CalPERS sought declaratory relief that would (1) interpret the term "employee" in the PERL in accordance with the common law definition of that term, and (2) affirm CalPERS's role as the first arbiter of whether an individual is an employee of a public agency for purposes of applying the PERL.

The majority purports only to resolve the threshold issue; but, of course, the answer is not so simple. While enrollment in CalPERS does not directly resolve whether plaintiffs are MWD's employees for nonretirement purposes, or even expressly determine their entitlement to CalPERS benefits, it inevitably gives considerable momentum to their broader claims.

Thus, despite its disclaimers, the majority's ostensibly narrow interpretation of the PERL is effectively dispositive of the more significant underlying question of plaintiffs' employment status. To say that a covered employee is any employee CalPERS says is a covered employee is a tautological response that not only rewrites the statute, it alters the whole purpose of the pension law.

## II.

The majority's approach has several shortcomings. First, it conflicts with and undermines the purpose and intent of the PERL. Second, it rewrites the

contractual relationship between MWD and CalPERS, between MWD and the labor suppliers, and between the leased workers and the labor suppliers while foisting on MWD an employment relationship it specifically contracted to avoid. Third, it presupposes, without analytical support, that the current common law test of "employee" is appropriate for determining the status of leased workers in this, or any other, context. Finally, and in conflict with the separation of powers doctrine, it preempts the Legislature from determining whether and in what manner to treat leased workers differently in the public employment context.

## A. Purpose and Intent of the PERL

"[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) "The Legislature enacted the Public Employees' Retirement Law (Gov. Code § 20000 et seq.), 'to effect economy and efficiency in the public service by providing a means whereby employees who become superannuated or otherwise incapacitated may, without hardship or prejudice, be replaced by more capable employees . . . .' " (*Pearl v. Workers' Comp. Appeals Bd. (2001)* 26 Cal.4th 189, 193 [109 Cal.Rptr.2d 308, 26 P.3d 1044].) Courts also deem civil service pensions to serve as an inducement to competent persons to enter and remain in public service. (*Packer v. Board of Retirement* (1950) 35 Cal.2d 212, 217 [217 P.2d 660].)

Neither the explicit nor the implicit purpose of the PERL is served by a determination that leased employees must be enrolled in CalPERS. These employees have chosen to work for private employers, without additional pension inducement and subject to termination at will when their services are no longer needed. The rule of liberal construction applicable to the PERL serves to effectuate the legislative intent of securing and retaining competent individuals for public sector employment in the first instance. It does not support a construction contrary to the statutory purpose, endorsing eligibility for workers clearly outside the PERL's intent. (See *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 473 [1 Cal.Rptr.3d 790].) In such circumstances, the court should approach its interpretive task with utmost circumspection rather than with the blithe assumption that a superficial construction suffices.

Indeed, while arguing that the purpose of the PERL should be liberally construed, plaintiffs, seconded by CalPERS, invoke a canon of construction intended to limit the scope of legislative enactments: that, as a general rule, statutes will not be interpreted to alter common law rules absent a clear statement to that effect. " ' "A statute will be construed in light of common law decisions, unless its language ' "clearly and unequivocally discloses an

intention to depart from, alter, or abrogate the common-law rule concerning the particular subject matter . . . ." [Citations.]' [Citation.]" ' " (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297 [65 Cal.Rptr.2d 872, 940 P.2d 323].) Even assuming the legal and analytical validity of this court-formulated precept in ordinary circumstances where it occasions no great harm (see Corrigan & Thomas, *"Dice Loading" Rules of Statutory Interpretation* (2003) 59 N.Y.U. Ann. Surv. Am. L. 231), plaintiffs here ask the court to rely on it to undermine a clearly expressed legislative purpose, contrary to the court's primary statutory construction directive.

### B. LEASED WORKERS AND THE COMMON LAW TEST OF "EMPLOYEE"

With respect to the common law, plaintiffs' and CalPERS's argument contains a second fundamental analytical flaw—the uncritical assumption that "employee" as defined under the *current common law test applies without further consideration to leased workers.*

Plaintiffs, and by its language the majority (see maj. opn., *ante,* at pp. 498, 503, 504–505), assume the PERL incorporates a static common law definition of "employee" under which control over performance of the work is the most significant factor. This assumption erroneously ignores, or disregards, the essence of the common law: the evolution of court-crafted jurisprudence to address new circumstances and legal questions. Leased workers present a new paradigm, a three-sided labor relationship in which control has been expressly separated from other aspects of employment.

In support of their position, plaintiffs rely heavily on the Restatement Second of Agency (1958) (Restatement), section 220, and its apparent focus on the factor of control. Section 220, subdivision (1), defines a servant as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." Section 220, subdivision (2)(a) lists 10 factors relevant to distinguishing employees from independent contractors, the first factor being "the extent of control which, by the agreement, the master may exercise over the details of the work."

This court has previously quoted with approval these provisions of the Restatement and characterized control as "the principal test" (*Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 946 [88 Cal.Rptr. 175, 471 P.2d 975] (*Tieberg*)) in defining employment for purposes of the Unemployment Insurance Code. (See also *McFarland v. Voorheis-Trindle Co.* (1959) 52 Cal.2d 698, 704–706 [343 P.2d 923]; *Industrial Ind. Exch. v. Ind. Acc. Com.*

(1945) 26 Cal.2d 130, 135 [156 P.2d 926] [same in workers' compensation context].) At the same time, we recognized that control is not dispositive and that several other " 'secondary elements' " (*Tieberg,* at p. 950) may be relevant in assessing employment status. (*Id.* at pp. 949–950; see also *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 352 [256 Cal.Rptr. 543, 769 P.2d 399]; *Laeng v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 771, 777–778, fn. 7 [100 Cal.Rptr. 377, 494 P.2d 1].) Moreover, the court has never considered how these various elements would affect the status of leased workers. It is far from clear the same factors would predominate.

Indeed, the Legislature has taken the lead in suggesting that a distinct rule should apply to leased workers. Section 606.5, subdivision (b), of the Unemployment Insurance Code provides that, for purposes of that code, the common law control test governs employee status in all cases *except* that of leased workers, expressly recognizing they present a separate case. In other contexts as well, the Legislature has made .independent provision for worker leasing. (See Lab. Code, § 3602, subd. (d) [addressing workers' compensation coverage for leased workers]; see also Cal. Code Regs., tit. 2, § 7286.5, subd. (b)(5) [defining employment for purposes of workplace discrimination against an employee of a "temporary service agency"]; cf. 29 C.F.R. § 825.106(b)–(e) (2003) [designating the leasing employer as the employer for purposes of family leave].) Even CalPERS's own handling of the issue indicates—contrary to the position it takes in this litigation—that it has heretofore recognized worker leasing as a distinct phenomenon calling for development of a new "system-wide approach"; and the State Administrators' Handbook, from which CalPERS obtained its working summary of the common law control test, elsewhere indicates special considerations apply in these circumstances.

Undue emphasis on control assumes an overly reductionist approach to the common law. However close a link between control over the way the work is performed and employment in other contexts, in the case of worker leasing, control is relatively insignificant because the purpose of the labor relationship is to separate control from other terms of employment. Moreover, the worker enters into and accepts, generally expressly, this three-sided labor relationship fully aware of its purpose. As the Restatement recognizes, a relevant determinative of an employer-employee relationship is "whether or not the parties believe they are creating the relation of master and servant." (Rest., § 220, subd. (2)(i); see also *Tieberg, supra,* 2 Cal.3d at p. 949 [88 Cal.Rptr. 175. 471 P.2d 75].).) Since the parties' intent dominates the relationship among worker, labor supplier, and labor hirer, this element logically should weigh more heavily than control of work performance in determining employment status.

The Restatement is at best a snapshot of the common law as it existed in 1957. Because it *follows* the law—summarizing consensus and organizing relevant legal principles—it cannot serve as a definitive guide to assessing a new labor structure, one which reflects unprecedented economic, technological, and demographic transformations in our society. This does not render the PERL, with respect to the common law definition of employment, a moving target. The fundamental common law conception of employment has not changed. Rather, to the extent their significance varies from the original norm, the relevant factors must be reweighed in this new context, consistent with the intent of the parties.

The Restatement was formulated at a time when employee leasing in its purest form did not even exist. Thus, it differentiates only between employees and independent contractors, not employees and leased workers. Nor does the Restatement or our cases dealing with employee lending discuss the paradigm of labor supply and consumption. (See, e.g., *Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174 [151 Cal.Rptr. 671, 588 P.2d 811].) For example, the labor relationship at issue here differs distinctly from that of one employer lending another employer one of its skilled employees for an occasional task. (See, e.g., Rest., § 227, com. c, illus. 3, p. 502.) Contrariwise, a labor supplier *is in the business* of providing workers to consumers temporarily in need of certain services. The latter situation represents an entirely new labor relationship in which control of the work is exclusively within the purview of the labor consumer; and, as all parties contractually agree, every other aspect of employment is exclusively within the purview of the labor supplier. Common law rules that evolved to address the traditional two-sided labor paradigm are simply inapposite in this context.

Moreover, the Restatement developed its definition of "employment" specifically in the context of assigning tort liability to employers under the doctrine of respondeat superior. Here, the predominant consideration is the statutory purpose of the PERL, which "is to effect economy and efficiency in the public service by providing a means whereby employees who become superannuated or otherwise incapacitated may, without hardship or prejudice, be replaced by more capable employees" (Gov. Code, § 20001) and to attract the best employees to public service. (*Packer v. Board of Retirement, supra,* 35 Cal.2d at p. 215.) These statutory purposes are very different from the question of assigning tort liability, a question plainly more closely aligned with the common law control test than with pension entitlement. (Cf. *Santa Cruz Poultry, Inc. v. Superior Court* (1987) 194 Cal.App.3d 575 [239 Cal.Rptr. 578] [labor consumer is employer of leased worker for purposes of workers' compensation law].) There is no logical reason control should determine employment status in the latter circumstance even if it does in the former, particularly when the parties have expressly separated control from every other aspect of employment.

In sum, ultimately the courts, not the Restatement, delineate the evolution of the common law definition of "employee" and identify the factors that should assume primary significance in any particular worker context.

Uncritical application of the Restatement's control test fails to recognize that the leased worker of today is unlike the lent employee of 1958. In *Vizcaino v. United States Dist. Ct. for the Western Dist. of Wash.* (9th Cir. 1999) 173 F.3d 713 (*Vizcaino*), the Ninth Circuit Court of Appeals considered whether leased workers (temporary agency employees) who provided services to Microsoft were employees for purposes of participation in Microsoft's employee stock purchase plan. The court conceded "that the assessment of the triangular relationship between worker, temporary employment agency and client is not wholly congruent with the two-party relationship involving independent contractors." (*Id.* at p. 723.) Nevertheless, the court applied the Restatement—with its dispositive emphasis on control—as a fixed body of law, failing to recognize the common law as an organic element of the law intended to adapt itself to new circumstances. (See also *Wolf v. Coca-Cola Company* (11th Cir. 2000) 200 F.3d 1337, 1340–1341 [leased worker may be employee of labor consumer for purposes of Employee Retirement Income Security Act]; *Burrey v. Pacific Gas & Electric Company* (9th Cir. 1998) 159 F.3d 388, 391–392.)

In my view, the better rule is expressed in *Roth v. American Hospital Supply Corp.* (10th Cir. 1992) 965 F.2d 862 (*Roth*), in which the court considered the claim of a leased worker that, for purposes of the Employee Retirement Income Security Act (ERISA; 29 U.S.C. § 1001 et seq.), he was an employee of the business that leased his services. The court found that ERISA incorporated the common law definition of employee and specifically section 220 of the Restatement. (*Roth,* at p. 866.) However, in applying the common law definition in the context of worker leasing, the court noted that "[t]he issue . . . is one not squarely addressed by the common law test . . . ." (*Id.* at pp. 866–867.) "Many of the common law factors are, unsurprisingly, inapplicable to this inquiry." (*Id.* at p. 867.) Under the circumstances, the court concluded that control over the work of the leased worker was less significant than the clear intent of the parties. (See also *Capital Cities/ABC, Inc. v. Ratcliff* (10th Cir.) 141 F.3d 1405.)

Accordingly, the role of the court should not be to judge the propriety of a labor relationship otherwise permitted by law, but to effectuate the intent of the parties, particularly one they all knowingly and intentionally accept. Here, since MWD intended to avoid entering into an employer-employee relationship with plaintiffs, and they, in turn, willingly accepted their jobs on the terms offered, the courts should recognize their mutual intent as the principal consideration in determining plaintiffs' employee status. Assuming MWD did

not actively mislead plaintiffs, they should not be allowed after the fact to redefine the agreed-upon terms of the labor relationship. As the court in *Roth* explained, where parties knowingly and intentionally separate control over work performance, a court should not override that intent. (*Roth, supra,* 965 F.2d at p. 868.) This does not "remake the law to conform to MWD's hiring practices" (maj. opn., *ante,* at p. 497), but discharges the court's responsibility to reexamine and develop the common law in new circumstances. (See Llewellyn, The Common Law Tradition (1960) pp. 293–294.)

Contrary to the fundamental precepts of the common law, the majority here views the question presented in statutory isolation, focusing on the PERL and refusing to assess the unique position of leased workers. Like the lower courts, the majority erroneously views worker leasing as bilateral. But by definition this is a three-party labor relationship, the very purpose f which is to separate control over work performance from every other aspect of employment and thus realign the parties' relationship whereby labor consumers are not employers. The majority's failure to recognize the legal significance of this distinct labor structure arbitrarily adjudicates the obligations of the parties contrary to their original expectations.

### C. CONTRACTUAL IMPAIRMENT

In this regard, the majority also fails to consider the impact of its holding on contractual rights and expectations. While it disclaims the power "to remake the parties' agreement" (maj. opn., *ante,* at p. 497), its analysis accomplishes exactly that. Given the contractual relationship between MWD and CalPERS, their respective conduct over the course of nearly 60 years is highly relevant to determining their understood intent. (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 689, pp. 622–623.)

For purposes of PERS entitlement, CalPERS has heretofore only used the common law control test to distinguish independent contractors. Its long-term dealings with MWD give no indication that CalPERS regularly or consistently applied any version of that test to leased workers or that it had ever developed a formal, system-wide policy with respect to leased workers. Similarly, nothing in the record indicates CalPERS had, prior to this litigation, definitively interpreted the PERL as including leased workers within its definition of "employee." Nor did MWD understand the PERL in that way.

Thus, even if MWD's leased workers are employees for purposes of the PERL, that holding cannot apply retroactively if the parties' conduct indicates they never interpreted their contract in that way. The majority's contrary implication imposes on MWD a potentially huge liability it had no basis for anticipating. (See dis. opn. of Baxter, J., *post,* at p. 521.) If the historic

understanding of the parties with respect to the PERL is at odds with the court's present construction of that law, then the contract involves a mutual mistake of law and is, to that extent, subject to rescission. (1 Witkin, Summary of Cal. Law, *supra,* Contracts, §§ 377, 378, pp. 344–345.) Any other conclusion would bind MWD to a contractual term that no party bargained for or understood to exist. Nevertheless, the majority completely ignores the legal significance of this contractual history.

### D. Preemption of the Legislature

Noting that the PERL contains "no broad exclusion for long-term, full-time workers" (maj. opn., *ante,* at p. 497), the majority declares that "[a]ny change in the PERL to accommodate such long-term temporary hiring must come from the Legislature, not from this court, which cannot remake the law to conform to MWD's hiring practices." (*Ibid.*) With due respect, this completely inverts the statutory analysis. Given the historical perspective of leased workers, there is no basis for finding the PERL would have contemplated leased workers in the first instance; thus, there would be no reason for the Legislature to refer to them, either by inclusion or exclusion. In other words, contrary to the majority's unsupported assumption, their absence from the statutory scheme has no legal significance. By investing this purported omission of any reference to leased workers with legal substance, the majority itself rewrites the statute—inferring that public employers are prohibited from using leased workers outside the purview of the PERL.

The specific question raised in this case is whether a public agency that has purchased labor from a labor supplier in lieu of hiring its own employees must enroll these workers in CalPERS. Under this new three-sided model, the labor consumer is no longer the employer of the worker. Instead, the employment contract lies between the worker and a third party—a labor supplier—that separately contracts with labor consumers to satisfy their labor needs. In the abstract, this new labor paradigm appears to be simply a matter of personal choice and private agreement. Disputes, however, arise when workers who have willingly entered into employment contracts with labor *suppliers* then seek the rights and benefits of employment with the labor *consumers.* In essence, these workers ask the courts to redraw the boundaries of the three-sided relationship.

That task is clearly one the court should defer to the Legislature, which can better assess the policy implications and balance the respective interests of the public and individual workers. Indeed, the Legislature has already taken action where it has thus far deemed it appropriate. (See Lab. Code, § 3602, subd. (d); Unemp. Ins. Code, § 606.5, subd. (b); see also Cal. Code Regs., tit. 2, § 7286.5, subd. (b)(5).) In effectively subverting the parties' deliberate

effort to separate control from employment, the majority ignores this express validation of employee leasing as an acceptable, and presumably desirable, economic innovation. Contrary to the implication of the majority's analysis, the Legislature has already determined that control over work may be legally separable from employment. The majority asserts no basis, other than a legislative vacuum, for finding that the two are inseparable in the context of the PERL, particularly given the PERL's vague definition of "employee."

The PERL does not mention the common law control test. This test becomes part of the statutory scheme only by virtue of judicial interpretation. Thus, while plaintiffs argue the PERL incorporates the same common law rule that applies outside the context of the PERL—they ignore the fact that nothing in the common law rule prohibits a labor consumer from leasing workers—and having control over their work—without thereby becoming an employer. Any other interpretation of the common law would bring it into conflict with the Legislature's express approval of employee leasing.

Moreover, given the policy considerations, it should be for the Legislature, not this court, to address the narrower question of whether a public agency should be permitted to use leased workers to meet its labor needs. Unlike the broader proposition of using leased workers generally, that narrower question raises distinct concerns because these workers can provide a public agency with a means to avoid certain costs and burdens that apply exclusively in the public employment context, such as merit selection requirements and the possibility of suits under 42 United States Code section 1983. For that reason, the Legislature might reasonably place restrictions on public agencies as regards their use of leased workers. But, that is a legislative, not judicial prerogative. Whatever reservations we may harbor in this regard, the legislative process should be allowed to work. If limitations are appropriate, we must assume that the Legislature will act accordingly. Until that time, the court's function is to develop the common law to meet the changing circumstances of the workplace.

Contrary to the majority's implication, recognizing a special rule for employee leasing does not carve out an exception to the PERL's definition of "employee" without any basis for such an exception in the statutory language. (Cf. Gov. Code, §§ 20300 [excluding independent contractors], 20502 [allowing for contractual exclusion of specified groups by contracting agencies].) Rather, in identifying a special rule applicable to leased workers, this court would be construing the common law, not the PERL, which incorporates the common law.

This case is not a referendum on the legality, morality, or any other aspect of public agencies' utilizing leased workers to supplement their workforce.

That question is completely separate from the one the majority purports to answer, one that implicates policy concerns principally within the legislative purview and one the Legislature has yet to directly address in this context. Given the legislative vacuum, this court should be wary of arrogating to itself or CalPERS the authority to determine whether this new class of workers is entitled to CalPERS membership.

## III.

In sum, I do not think the Legislature intended to strike a fatal blow to worker leasing when, in 1943, it first enacted the PERL's rather vague definition of public agency employee. More likely, it did not even consider the issue at that time. When it did consider the issue 43 years later in defining the employer-employee relationship in another statutory context, the Legislature gave its imprimatur to employee leasing by making express provision for it. This latter point, more than any other, should settle the issue before us. The common law definition of "employee" cannot work to foreclose an innovative labor relationship that the Legislature has explicitly recognized. Rather, in deference to and consistent with that legislative approval, we should interpret the common law to accommodate worker leasing by adjusting the relevant test to reflect the singularity of this new labor relationship, one in which the control factor assumes less, and the intent of the parties greater, significance.

I agree with the majority's rejection of MWD's argument that subdivision (b) of Government Code section 20028 "should be read as containing the same control-of-fund limitation as section 20028, subdivision (a)." Such an interpretation is unsupported by the statutory language (see maj. opn., *ante,* at p. 501) and would improperly require this court to act in a legislative capacity. (*Id.* at p. 497.) Nevertheless, the "foundational" principle cited by MWD and its amici curiae—that CalPERS enrollment and CalPERS benefits should not be available to workers unless they have received "compensation" from a CalPERS employer—remains logically compelling and is the only position consistent with the express purpose of the pension scheme.

Therefore, even if the majority's determination that the PERL's definition of "employee" incorporates California's common law is correct, I would also conclude that the common law factors that are relevant to determining the existence of an employer-employee relationship do not have the same weight in every context, and that in the context of worker leasing, control over the manner in which the work is performed is not determinative of an employment relationship and does not override the express intent of the parties.[2]

---

[2] On this basis, I would disagree with CalPERS's long-standing conclusion that the PERL incorporates the 20-factor federal test into its definition of employee. (See *Yamaha Corp. of*

Thus, while I agree MWD is mandated by the PERL to enroll all common law employees in CalPERS, I also conclude, contrary to the majority's analysis, that a leased worker is not a common law employee and that the superficial answer to Issue A is correct but incomplete. A proper analysis of the underlying question is critical to the resolution of this litigation. For this reason, I would disclaim what will surely be the ultimate effect of the majority's analysis. Rather, I would address the question directly and discharge this court's fundamental obligation to develop the common law in light of changing circumstances.

**BAXTER, J.**—I respectfully dissent. In the case of a local public agency, such as defendant Metropolitan Water District of Southern California (MWD), that has voluntarily contracted with the California Public Employees' Retirement System (CalPERS) to include its eligible "employees" in CalPERS, the Public Employees' Retirement Law (PERL; Gov. Code, § 20000 et seq.)[1] grants service credit, upon which all pension rights are based, only for work *compensated from funds controlled by the contracting agency itself.* The agency's obligation to make pension contributions on a worker's behalf—the sine qua non of the worker's membership in CalPERS—also depends entirely on service *compensated by agency-controlled funds.* Plaintiffs here are workers employed by private labor suppliers. Though plaintiffs were assigned to perform services for MWD, their pay came entirely from the private employers, which used their own funds for that purpose. Hence, these services neither qualified for CalPERS pension benefits, nor gave rise to an obligation of MWD to pay contributions to CalPERS. Accordingly, plaintiffs neither were nor are eligible "employees" of MWD who must be enrolled as CalPERS members.

The majority's contrary conclusion, wrong on the law, also has potentially unfair, even calamitous, consequences for the agencies that have volunteered to provide their true employees with CalPERS benefits. CalPERS, which has primary responsibility for determining who are "employees" covered by the

---

*America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031] ["[T]he binding power of an agency's *interpretation* of a statute . . . is contextual . . . . [¶] . . . [I]t may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.]"].) First, nothing in the PERL indicates the applicability of federal law in this context; and our decisions discussing the common law definition of the employer-employee relationship nowhere indicate approval of the 20-factor federal test. More importantly, the federal test focuses exclusively on control, and for the reasons stated above, I see no indication that the Legislature intended control to be determinative of employment in the case of a leased worker, thereby prohibiting for purposes of the PERL what the Legislature expressly approved in the Unemployment Insurance Code.

[1] All subsequent unlabeled statutory references are to the Government Code.

system (§ 21025), has long known that public agencies were making increased use of leased workers. Indeed, CalPERS's staff internally noted the "escalat[ing]" implications of this practice for CalPERS pension purposes.

Yet, though it now supports plaintiffs' belated claims for membership, CalPERS never alerted contracting agencies that leased workers are the agencies' own "employees" in this regard. It never required these workers' enrollment in the system, and it never assessed ongoing employer and employee contributions toward their CalPERS pensions. On the contrary, internal memoranda indicate that CalPERS avoided the issue except in scattered individual cases. CalPERS deferred pertinent regulations and guidelines, decided only to "research[] further [its] position," and placed the problem on the "back burner," meanwhile conducting "a fact-driven review of each request for membership." In 1996, a knowledgeable CalPERS official stated internally that leased workers were "justifiably excluded" under current conditions.

The result of CalPERS's misleading procrastination is that MWD and many other local contracting agencies, which have budgeted on the assumption that leased workers were not their "employees" for pension purposes, may now have to enroll significant numbers of such workers, nunc pro tunc, as CalPERS members. Aside from future contributions to the system on the workers' behalf, these agencies may also now have to make up previously unpaid contributions that are actuarially necessary to finance full pension rights of those leased workers who have already worked long enough to "vest" in the system. I cannot join the majority's decision to expose financially strapped local agencies to this crushing burden.

In reaching their result, the majority essentially reason as follows: Unless the worker is expressly excluded by contract or statute (see, e.g., §§ 20300 et seq., 20502), the PERL requires every "employee" of an agency, such as MWD, which has agreed with CalPERS to participate in the CalPERS pension scheme (hereafter, a local contracting agency), to be a member of CalPERS as of the inception of the agency's CalPERS contract, or the employee's entry into employment, whichever is later. (§§ 20281, 20283.) The statute broadly describes an "employee" for this purpose as "[a]ny person in the employ of any contracting agency." (§ 20028, subd. (b).) Because section 20028, subdivision (b) does not further define or limit "employ" or "employee" in this context, we must assume the statute intends the multifactor common law test of employment. Hence, since MWD's contract with CalPERS did not expressly exclude workers furnished and paid by private labor suppliers, MWD must enroll all such workers, not statutorily ineligible for membership, who were MWD's common law employees.

I believe this analysis is flawed. The majority reject the argument of MWD and its amici curiae that workers are a local contracting agency's "employee[s]," for purposes of CalPERS enrollment, only if their work is *compensated from funds controlled by the agency itself.* Focusing exclusively on section 20028, which defines "[e]mployee," the majority note that while subdivision (a) expressly limits the employees of the state, a state university, or a county school superintendent to those workers compensated from funds "directly controlled" by such entities or officials, separate subdivision (b), applicable to the employees of "[local] contracting agenc[ies]," contains no similar express limitation.

The majority dismiss the contention that by virtue of other provisions of the PERL, a control-of-funds rule is *implied* in subdivision (b) of section 20028, and restricts the class of eligible "[e]mployee[s]" who must be enrolled in CalPERS. However, I find that interpretation persuasive.

We must construe specific statutory provisions in the context of the overall scheme of which they are a part (e.g., *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 903 [135 Cal.Rptr.2d 30, 69 P.3d 951]; *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 280 [87 Cal.Rptr.2d 222, 980 P.2d 927]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]), avoiding, if possible, anomalous or absurd results that contravene the Legislature's presumed intent (see, e.g., *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539]). The PERL's purpose is, of course, to establish a public employee pension system administered by CalPERS and funded by employer and employee contributions, and to determine eligibility for the system's benefits. As MWD and its amici curiae point out, the PERL makes clear that one who claims CalPERS pension benefits through a local contracting agency *may only obtain such benefits for service compensated from funds controlled by the agency itself.*

Because CalPERS membership simply reflects the member's potential eligibility for CalPERS benefits, it seems apparent that one cannot be a local agency's eligible "[e]mployee," and thus a compulsory member of CalPERS, if his or her only service fails, *ab initio, to qualify for such benefits by reason of the control-of-funds rule.*

Moreover, the PERL states explicitly that a CalPERS "[m]ember" is "an employee who has qualified for membership in this system *and on whose behalf an employer has become obligated to pay contributions.*" (§ 20370, subd. (a), italics added.) As I will explain, a contracting local agency's obligation to make pension contributions on behalf of a worker, like the worker's eligibility for benefits, is based solely on service compensated by agency-controlled funds.

The path to these conclusions is clear. We necessarily begin with the PERL's definition of "[s]tate service"—the basis upon which all CalPERS eligibility, benefits, and contributions are calculated. Under section 20069, subdivision (a), " '[s]tate service' means service rendered as an employee . . . of . . . a contracting agency, . . . *and only while he or she is receiving compensation from that employer therefor . . . ."* (Italics added.) Section 20630 provides, in turn, that "[a]s used in this part, 'compensation' means the remuneration *paid out of funds controlled by the employer* in payment for the member's services . . . ." (Italics added.)[2]

A member may retire "for service" only "if he or she has attained age 50 and is credited with *five years of state service."* (§ 21060, italics added.) Upon such "retirement for service" (§ 21350), the "service retirement allowance" *(ibid.)* of a "local miscellaneous member" is calculated on three variables—the member's age at retirement, his or her years of "service," and his or her "final *compensation."* (§ 21354, italics added.) Under the statutory definitions set forth above, the applicable years of "service" are only those years of work compensated from funds controlled by the local contracting agency, and the worker's final "compensation" must itself have been paid from such funds. To put it simply, no CalPERS service retirement allowance can be obtained or calculated except upon the basis of work so compensated. (But cf. fn. 4, *post.)* Accordingly, one is not eligible to receive a CalPERS service retirement allowance for work on behalf of a local contracting agency if the work was compensated entirely from funds outside the agency's control.[3]

As noted, the CalPERS pension system is funded by contributions from both CalPERS members and the public agencies that employ them. The normal rate of the employee contribution for local miscellaneous members is "7 percent of the *compensation* paid that member for *service* rendered on and

---

[2] Section 20284 provides that when "an employee *of the state*," as defined by section 20028, subdivision (a), is assigned to work for which, "pursuant to statute or duly authorized contract entered into by *the state* or the *state agency* by which the person is employed," he or she is compensated from "funds not directly controlled by the state," the person continues, while in that status, as an " 'employee *of the state,*' " and the person's work during such assignment "shall be 'state service' notwithstanding [s]ections 20028 and 20069." (Italics added.) No similar expansion of the definition of "state service" applies to *local* contracting agencies and workers who provide services to such agencies.

[3] Similar principles apply to eligibility of a local miscellaneous member for a *disability* retirement pension, and to the calculation of the final amount of such pension. Thus, a local miscellaneous member is eligible for a CalPERS disability retirement allowance only "if . . . credited with five years of *state service."* (§ 21150, italics added.) As indicated above, "state service" is service compensated from funds controlled by the CalPERS employer. Moreover, the final amount of a disability pension is based on the employee's "final compensation" and credited "years of service" (see §§ 21423, subds. (a), (b), 21427)—both of which require payment for service from funds controlled by the CalPERS employer.

after June 21, 1971." (§ 20677, subd. (a)(2), italics added.) Hence, the employees' contribution is based solely on work compensated by funds controlled by the public agency.

The employer's contribution is an amount calculated to produce, when combined with its employees' contributions, service retirement allowances for eligible employees in the amounts specified by the PERL. (See §§ 21350, 21354.) This contribution, actuarially determined on an annual basis, is not a uniform rate, but must be assessed, as to each employer, on the basis of that employer's "own experience" with respect to its employees' eligibility for retirement benefits. (§ 20815, subd. (a); see also § 20814, subd. (b).)

Thus, the employer's duty to contribute is limited to the amount actuarially necessary, when combined with employee contributions, to pay pensions for its *eligible workers on the terms and conditions set by the PERL.* As explained above, that pension eligibility is based upon *state service*—service compensated from funds controlled by the employer—and calculated on the basis of the employees' *final compensation*—compensation paid from funds controlled by the employer. It follows that a CalPERS employer has no obligation to contribute on behalf of workers who have not rendered service, or received compensation, from funds controlled by the employer, and are thus not eligible to receive CalPERS retirement benefits. And persons for whom the employer is not obligated to contribute need not be enrolled as CalPERS "[m]embers." (§ 20370, subd. (a).) That is the status occupied by the plaintiffs in this case.[4]

The majority suggest the issue whether plaintiffs must be *enrolled* as CalPERS *members*—all the majority purport to decide here—is separate from their eligibility, if any, for CalPERS retirement benefits. I disagree. As indicated above, the statutory scheme, read as a whole, restricts and limits compulsory CalPERS membership to those workers who can qualify for CalPERS retirement benefits. Under the control-of-funds rule that underlies

---

[4] The majority point to several sections of the PERL, cited by CalPERS, which, they assert, suggest that a CalPERS pension need not always be calculated exclusively upon the basis of work compensated from funds controlled by the CalPERS employer. For example, section 20024 defines "current service"—one component upon which the final amount of a pension is calculated (see. e.g., § 21350, subd. (b))—to include not only "state service," but also "service in employment while not a member but after persons employed in the status of the member were eligible for membership." Whatever the technical meaning of this provision, it does not undermine the requirement of minimum "state service"—i.e., service compensated from funds controlled by the employer—as a prerequisite to the eligibility of a local miscellaneous member for *any* retirement pension, whether "service" or "disability." (§§ 21060, 21150.) Similarly, to the extent a pension is calculated on such bases as the worker's "final compensation," "special compensation," "compensation earnable," and "payrate" (§§ 20037, 20636) none of these technical terms is defined to suggest that the "compensation" referred to in these phrases is other than "compensation" as defined generally for all PERL purposes, which "compensation" must be paid from funds controlled by the employer. (§ 20630.)

all eligibility for such benefits, plaintiffs, whose work was entirely compensated by private labor suppliers, are unable to do so. Indeed, as MWD and its amici curiae stress, the Legislature cannot have intended to compel the meaningless act of CalPERS enrollment for persons who, from the outset, are unable to qualify for CalPERS benefits.[5]

The majority, like plaintiffs and their amici curiae, insinuate that to exclude leased workers from CalPERS under a control-of-funds requirement is to encourage and reward an easy subterfuge, by which public agencies may bypass their merit hiring systems, and may deny the full benefits of public employment to large numbers of persons who essentially function as employees. But plaintiffs have raised no challenge to the legality of MWD's use of leased workers. They simply seek to "have their cake and eat it too." They agreed to be employed, not by MWD, but by private entities that leased their services to MWD. This choice spared them the rigors of a competitive merit selection system in obtaining their positions. It may well have enhanced their take-home pay, as well as increasing their flexibility and mobility. They have made no contributions to CalPERS, and, as MWD and its amici curiae point out, they may already be covered under pension plans provided by their private employers. Yet, without assuming the burdens of competitive merit employment by a public agency, they now seek the very benefits they decided to forgo.

Moreover, though the majority suggest otherwise, it is entirely rational for the Legislature to determine, by means of a control-of-funds requirement, that workers employed and paid by others, like independent contractors (§ 20300, subd.(b)), should be excluded from CalPERS. In one case, the agency

---

[5] The majority suggest that membership enrollment is necessarily separate from determinations of pension eligibility because CalPERS itself has the authority to decide in the first instance, subject to judicial review, each individual member's eligibility for a CalPERS pension. (See § 21025.) I find these principles irrelevant to the situation presented by this case. Certainly, CalPERS, as the expert agency charged with administering the PERL, should take positions on issues of coverage affecting CalPERS employers and members (see text discussion, *ante*), and it may determine eligibility in individual cases by *applying* the legal principles set forth in the PERL to decide disputed facts, or mixed questions of fact and law. But courts may always decide pure questions of law on undisputed facts. Here it is undisputed that plaintiffs' paychecks were issued by private labor suppliers, not by MWD. The *suppliers* charged MWD fees for the workers' labor, which fees were based on the workers' agreed pay rate plus a "markup" for the services of the companies that employed and supplied the workers. Though the majority suggest otherwise, I believe this arrangement takes plaintiffs out of eligibility for CalPERS membership or pension benefits, as a matter of law, by virtue of the PERL's control-of-funds rule.

Though CalPERS now supports plaintiffs' position, the majority are not so bold as to invoke the principle of deference to CalPERS's expert agency interpretation. Their restraint on this point is wise. As indicated above, CalPERS dithered and delayed on the matter and never promulgated a formal construction of the PERL in line with its apparent current stance.

contracts with an individual for his or her independent services; in the other, it contracts with an independent entity for the services of persons the entity employs. The evidence indicates that public agencies tend to use independent contractors and leased workers in similar ways—to obtain flexible temporary assistance, or focused technical or consulting skills, that are needed only on a special or intermittent basis, without resort to the civil service system and its implications of tenured employment. It is hardly remarkable that the Legislature would consider both categories of workers to be appropriately excluded from the PERL's provisions for lifetime public pension benefits.

By concluding otherwise, after CalPERS's long failure to provide guidance to its contracting agencies, the majority impose, at this late hour, the potential for new and unexpected financial liabilities, significant in amount, on local government agencies throughout this state that already face unprecedented fiscal challenges. As I have explained, the current legislative scheme does not dictate such a result. Given the very substantial implications, it might now be well for the Legislature to confront and consider directly the issue how the growing phenomenon of leased workers is to be treated for public pension purposes.

In the meantime, I cannot join the majority's reasoning, or their result. I would reverse the judgment of the Court of Appeal.

Chin, J., concurred.